IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 117,723

IN THE MATTER OF THE ADOPTION OF C.L.

SYLLABUS BY THE COURT

1.

When a natural father assumes his parental responsibilities, the right to raise his child is entitled to constitutional protection.

2.

Adoption statutes are strictly construed in favor of maintaining the natural parents' rights when consent to adoption would not be required if those rights are terminated under K.S.A. 2016 Supp. 59-2136(h)(1).

3.

K.S.A. 2016 Supp. 59-2136(h)(1)(C) requires a determination that a father made no reasonable efforts to support or communicate with the child before his parental rights may be terminated under its provisions.

4.

Clear and convincing evidence is an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt. It applies when particularly important individual interests or rights are at stake.

5.

When an appellate court reviews a trial court's determination that is required to be based upon clear and convincing evidence, it considers whether, after review of all the evidence, viewed in the light most favorable to the proponent of the finding, it is

1

convinced a rational fact-finder could have found the determination to be highly probable.

Review of the judgment of the Court of Appeals in an unpublished opinion filed February 23, 2018. Appeal from Wyandotte District Court; KATHLEEN M. LYNCH, judge. Opinion filed October 5, 2018. Judgment of the Court of Appeals affirming the district court is reversed. Judgment of the district court is reversed and case is remanded with directions.

*Pantaleon Florez, Jr.*, of Topeka, argued the cause and was on the briefs for appellant natural father.

*Kevin W. Kenney*, of Kevin W. Kenney, P.A., of Prairie Village, argued the cause and was on the briefs for appellees adoptive parents.

The opinion of the court was delivered by

BILES, J.: When a natural father assumes his parental responsibilities, the right to raise his child is entitled to constitutional protection. *In re Adoption of G.L.V.*, 286 Kan. 1034, 1057, 190 P.3d 245 (2008). Underlying this doctrine is the common sense understanding that the natural father must have had a real-world opportunity to take on his obligation under the circumstances presented. See *In re Adoption of Baby Girl P.*, 291 Kan. 424, 433, 242 P.3d 1168 (2010) ("The preservation of a father's relationship with his child is the starting point of a termination proceeding, not the finish line that a father must labor to reach."). In this appeal from a district court's order terminating a natural father's parental rights, that understanding was lost in pursuit of another outcome.

We reverse the lower court rulings and remand to the district court for the purpose of conducting proceedings effectuating a change in custody consistent with this opinion. We do so fully aware that painful challenges and traumas lie ahead for those involved.

2

FACTUAL AND PROCEDURAL BACKGROUND

On Tuesday, September 13, 2016, baby boy C.L. was born in Topeka. According to his Mother, she did not know she was pregnant until earlier that morning. While in the hospital, Mother put the newborn up for adoption through Kansas Children's Service League, a not-for-profit agency with an affiliated infant adoption program. Mother signed relinquishment papers early Thursday afternoon, September 15. On the same day, KCSL placed the infant with a custodial couple who took the infant to their home in the Kansas City area. The couple hoped to become the adoptive parents.

Also on September 15, Melinda Kline, a KCSL social work supervisor, began trying to contact the person Mother believed was the baby's biological father. She spoke with him by phone about 7:49 p.m. Kline told Father about C.L.'s birth and that he was believed to be the father. This news shocked him.

Kline said the baby was already "placed" with prospective adoptive parents and explained she was asking him to relinquish his parental rights. She said the baby's mother wanted a closed adoption, i.e., one in which the natural parents would not have contact with the child. She could not recall later whether she clarified what that meant. Father asked who the baby's mother was. Kline refused to answer over the phone, preferring instead to meet with Father to sign relinquishment papers. Father asked if he would be able to meet with the prospective adoptive parents or see the baby. Kline's written log indicates she responded, "[T]his is usually dependent on trust with the adoptive family."

According to Kline, Father was initially receptive to signing relinquishment papers, but he disputes that. She believed the two would meet the next day to sign the papers. Kline's log states she advised Father her agency would provide "a free legal

3

consult if he requests." Father later testified that "[a]t no time" did he tell Kline he would surrender his rights.

The next day, which was Friday, September 16, Kline spoke to Father by phone at about 2:20 p.m. Father's mother joined the conversation. They told Kline that Father had an attorney, provided that attorney's contact information, and asked for a paternity test. Father's mother said if the baby was Father's, "they" wanted custody.

*The dueling court proceedings*

On the following Monday, September 19, at 1:14 p.m., the prospective adoptive parents filed a petition for adoption in Wyandotte County District Court. The petition also sought to terminate Father's parental rights because:

"a. The identified biological father, after having knowledge of the pregnancy, failed without reasonable cause to provide support for the biological mother during the six months prior to the Child's birth;

"b. The identified biological father abandoned the biological mother after having knowledge of the pregnancy;

"c. The identified biological father has made no reasonable efforts to support or communicate with the Child after having knowledge of the birth of the Child;

"d. The identified biological father abandoned or neglected the Child after having knowledge of the Child's birth;

"e. The identified biological father is unfit; and

"f. Termination of the parental rights of the identified biological father is in the best interests of the Child."

4

These alleged grounds for terminating Father's parental rights were made without prior factual investigation. More disturbingly, the termination allegations were substantively false when filed because Father had only learned of both the pregnancy and the birth barely four days before the filing. Nevertheless, the prospective adoptive parents verified these contentions were true under oath and their attorney signed the petition.

The next day, and with no knowledge about the out-of-county adoption action, Father filed a petition to establish paternity in Shawnee County District Court. Father stated he was "willing and able to meet the financial and emotional needs of the minor child" and was "a fit and proper person to be awarded the care, custody and control of the minor child." Father did not know the child's present address but believed the baby was placed in KCSL's care and custody. Father was "advised that the child has been placed with third parties [whose] identity is unknown." Father asked the court to

> "enter an order for genetic testing to determine the paternity of the child, if appropriate, acknowledging Petitioner as the father of the minor child, *establish child support for said minor child pursuant to Kansas law, award custody of the minor child to the Petitioner and designate the Petitioner as residential parent*, establish a parenting time schedule for each party with the minor child, an Order for name change and amendment of the birth record and for such further relief as the court deems just and equitable." (Emphasis added.)

On October 5, Mother filed a motion to stay the Shawnee County case. This was filed through counsel who was representing Mother in the Wyandotte County adoption case. Mother's counsel was supplied by KCSL, but the record is unclear who paid for the legal effort to stay Father's paternity action. The motion asked that the Shawnee County case be suspended until the Wyandotte County adoption concluded because that litigation was filed first. It further asserted if Father's parental rights were terminated in the

5

adoption case, the paternity case would be moot. Mother's motion argued that "any Order of custody, support, parenting time or paternity entered in this case will contravene the prior, and thus, superior jurisdiction held by the Court in Wyandotte County."

On October 25, the Wyandotte County court ordered a hearing on the adoption petition and scheduled it for November 29. It required Father to be notified by personal service. For reasons undeveloped in the record, Father was not served until 32 days later—Saturday, November 26, at a little after 5 p.m.—for the hearing that Tuesday. We note state law requires this notice not include a copy of the adoption petition, so the record is silent what Father knew going into the hearing. See K.S.A. 2016 Supp. 59-2133(d). The record also does not reflect that Father's attorney was informed of the November 29 hearing, even though he entered his appearance in the adoption proceedings on November 4.

At the November 29 hearing, Father appeared in person and by counsel. Father objected to the adoption. The court ordered Father to arrange and pay for genetic testing with the laboratory to schedule the baby's DNA sample. It also agreed with the prospective adoptive parents' request that "[Father] and his attorney have no access to the documents in the Court's case file other than a redacted copy of the Petition for Adoption."

On December 6, the Shawnee County District Court stayed Father's paternity case. The order noted the Wyandotte County court achieved jurisdiction first and had already ordered paternity testing, so further hearings would be duplicative of Father's requested relief in Shawnee County.

6

*The parental rights termination hearing*

On December 13, Father complied with the Wyandotte County court's November 29 order for a DNA sample. The baby was not tested until January 9, 2017. On January 27, the DNA lab report was filed. The results showed "[t]he alleged father . . . cannot be excluded as the biological father of the child . . . since they share genetic markers. . . . [T]he probability of paternity is 99.99%, as compared to an untested, unrelated man."

On March 24, just 56 days after the paternity results were filed, the Wyandotte County court conducted the evidentiary hearing on Father's parental rights termination. The prospective adoptive parents called as their witnesses Mother, Father, Kline, and the prospective adoptive father. Father returned to the witness stand in his case in chief and also called his mother.

Mother testified she learned she was pregnant the morning she gave birth and that she never told anyone she was pregnant before that day. Mother admitted Father contacted her while she was in the hospital before he learned about the birth. In a text message, Father asked why she was in the hospital. She told him "[t]hey had to cut me open" and "[t]hey haven[']t really told me anything as of right now." She said Father expressed sincere concern for her and her health. Mother did not tell Father about the baby "[b]ecause I wanted to tell him in person because I would think it was inappropriate for me, myself to talk to him about it over the phone," but Kline did that before she could.

Mother had an on-again, off-again romantic relationship with Father between 2012 and December 2015. She broke up with him in the summer of 2014, because she believed he had an alcohol abuse problem. After a week, they began dating again until she broke up with him in December 2015. She described their relationship after that as more than a "casual" friendship because they occasionally slept together. She did not consider it a

7

boyfriend/girlfriend situation. Mother said after the birth Father provided her with no financial support for the child.

Father testified he learned about the birth from Kline on September 15, 2016. He believed the baby was his son all along. He said his purpose in being in court was to seek to raise his child.

Father worked in Topeka at the time of the hearing, making a $14.50 hourly wage. Most weeks he worked overtime, for which he received time-and-a-half pay. Father lived with his mother and 28-year-old brother in a three-bedroom apartment. All three worked full time and shared expenses. He had just purchased a 2014 model car, paying $460 per month. When asked about the expense of raising a child, Father acknowledged he was "[f]ully aware" that it costs money to support a child, although he did not know exactly how much or whether it costs "hundreds, perhaps thousands of dollars a month." But he testified he "definitely [has] money to support my child, and I make good money."

At the time of the hearing, C.L. was six and a half months old. Father conceded he had not provided the child with any financial or material support and had not asked "if or how" he could help the prospective adoptive parents nor asked if there were any unpaid medical bills. And although Father had not provided financial support yet, he had purchased baby toys, clothes, bottles, a car seat, a crib, and a play pen, among other things, in preparation of taking custody. He and his mother prepared a room for the baby in their home. They made these preparations a couple of weeks earlier.

Father said shortly after the birth he transitioned from his mother's health insurance to his own coverage through his employer because he "knew [he] needed health insurance to put the baby on . . . ." But he did not tell the prospective adoptive parents, their lawyer, or KCSL about this. He never had his own lawyer tell anyone either. The

8

record is unclear whether insurance coverage for C.L. was accessible prior to establishing paternity and securing appropriate court orders. When asked why he bought the car instead of supporting his child, Father responded he needed a reliable and safer car for a baby.

Father acknowledged he knew the prospective adoptive parents had been caring for the baby since birth. He did not know their identity, although he acknowledged he had the opportunity to sit next to the adoptive parents in court on three occasions. Father conceded he never asked how C.L. was but clarified he had not spoken to them in any context. Father also was unaware of any communication his lawyer may have had with opposing counsel about the baby and had not asked his lawyer to initiate any. Father also never asked Kline about the child. Father had not sent a letter or card to the baby through his lawyer or opposing counsel.

But Father said he was committed to fighting for his baby. He said he told Kline

> "that I think . . . this whole situation is messed up, that this is my kid, and just basically the whole situation I talked to her about it, like, it's just messed up like, you know, it's messed up to take a baby away from these people, but I told her, you know, that this is my kid and I mean, it's messed up to take the baby away from me so . . . I mean, the whole situation is really messy."

Kline testified about her conversations with Father and identified her logs of those discussions. She explained Father had three ways to contact her:  phone, text, and Facebook. She had also given him the adoption agency's name and address. Despite this, she said, Father had not provided the child any support through KCSL. Father had not asked how the baby was doing and had not provided gifts, letters, photos of himself, or anything else to pass along. There is nothing in the record showing KCSL had any such

9

pass-along mechanisms for putative parents to use or that Father was advised about them if they did exist.

The prospective adoptive father testified next. He said he and his wife took C.L. home from the hospital on September 15 and provided for his care ever since. He said they neither received support from Father nor had any contact with him or on his behalf.

Father and his mother testified on Father's behalf. Father's mother spoke favorably about Father. She described him as a "go-getter" and said he was up for a promotion at work. She said Father had never called into work sick and worked Monday through Friday and most weekends. She said there was a positive change in Father in the year or so he had been working at his present job.

Father testified he filed the paternity suit that sought "to establish child support for the child pursuant to Kansas law" but was not specifically intending to force Mother to pay child support. Father noted he had asked the Shawnee County court to be allowed to meet the child's financial and emotional needs and was willing and able to do so. Father said he would be the residential parent. He agreed that, "as far as [he] knew," it was his "understanding that [he was] prohibited by Court Order from attempting to make contact with the child."

*The lower court rulings*

On April 26, 2017, the district court terminated Father's parental rights. The court limited its consideration to two statutory grounds: (1) Father abandoned or neglected C.L. after having knowledge of the birth; and (2) Father had made no reasonable efforts to support or communicate with C.L. after having knowledge of his birth. The court made the following findings of fact and conclusions of law:

10

"K.S.A. 2016 Supp. 59-2136(h)(1)(A) states the court may terminate the parental rights of the natural father if the court finds by clear and convincing evidence the father abandoned or neglected the child after having knowledge of the child's birth. *Black's Law Dictionary*, Sixth Edition defines Abandon as, 'to desert, surrender, forsake or cede.' *Black's* page 2. [Father] has never had any contact with the minor child. [Father] did not ask the mother to see the child. [Father] did not ask the case manager to see the child. *Black's* also defines neglect as 'May mean to omit, fail or forbear to do a thing that can be done, or that is required to be done.' *Black's* page 1032. There have been no requests from [Father's] lawyer to Petitioner's lawyer to have contact with the minor child. Again, it is noted by this Court that the stay in the Paternity case did not include any language prohibiting contact between the minor child and [Father]. There is no evidence that [Father] requested information about . . . the child's health and welfare after placement with the proposed adoptive parents. There is no evidence before the court that [Father] requested a picture of the child. The court recognizes that [Father] caused a paternity action to be filed. However, that step alone is not enough to support a finding that [Father] has 'assumed a sufficient level of parental responsibility under Kansas law to entitle his parental rights to constitutional protection.['] *Adoption of G.L.V*, 286 Kan. at 1061-62, 190 P.3d 245. The petitioners have proved by clear and convincing evidence that [Father] abandoned or neglected the child after he was made aware of the birth of the child.

"K.S.A. 59-2136(h)(l)(C) states, 'the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth[.]' In the case at bar, [Father] testified, 'money is not a problem for me.' Further, he testified as to his income and expenses and it is clear he had money to support the child during the pendency of this action. In fact the father stated, 'I don't know how much it will cost. I have money to raise it.' Despite the father's statements about his money, there is no evidence he provided financial support of any kind to the child through the case worker or through his lawyer. In fact, [Petitioners] presented evidence that no offers of support had been made by [Father]. During his testimony, [Father] claimed he put the child on his insurance through his employer. However, he did not communicate this fact to anyone and therefore, it has no impact. Had [Father] provided this information to [Petitioners]

through their lawyer, the birthing expenses of the child would have been covered under [Father's] plan. The adoptive parents paid the birthing expenses in the amount of $6500. In contrast to the father in *Adoption of G.L.V*, [Petitioners] presented evidence that [Father] gave the child no gifts and made no explicit offers of support concerning the child. Furthermore, the [Petitioners] presented evidence that [Father] sent no letters to the child; [Father] sent no mementos to the child and sent no Christmas gifts to the child. Although [Father] did not have the address of the prospective adoptive parents, he could have and should have sent communication and gifts through the lawyers involved. This court concludes that the petitioners have met their burden of proof that [Father] made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth."

Father appealed to the Court of Appeals. He argued the evidence and applicable law did not support termination of his rights under either K.S.A. 2016 Supp. 59-2136(h)(1)(A) (abandonment or neglect) or K.S.A. 2016 Supp. 59-2136(h)(1)(C) (no reasonable efforts to support or communicate). A Court of Appeals panel affirmed. *In re Adoption of C.L.*, No. 117,723, 2018 WL 1022887 (Kan. App. 2018) (unpublished opinion).

The panel concluded Father's "explicit concession" that he did not provide or offer direct financial support "on behalf of the child through KCSL, Mother, or petitioners' attorney" was fatal. 2018 WL 1022887, at *4. The panel rejected Father's claim that "he sought to provide financial, emotional, and other support for his child through the paternity action" because "the paternity petition . . . was stayed without any limitation upon his ability to provide support through [the adoption] proceedings." 2018 WL 1022887, at *4. "While [Father] challenged the adoption and termination and filed the paternity action, he concededly made no effort to either communicate with or support the child in any respect." 2018 WL 1022887, at *5. According to the panel, "while the filing of the paternity action . . . may have ultimately afforded Father the opportunity to support

12

and communicate with his child, his legal efforts cannot make up for the evidence that he made no reasonable effort to support or communicate with C.L. after learning of his birth." 2018 WL 1022887, at *5.

As to the district court's alternative basis for termination, the panel held the record did not support the conclusion that parental rights termination was justified under K.S.A. 2016 Supp. 59-2136(h)(1)(A) (abandoned or neglected child). After reciting the Black's Law definition of abandonment, the panel concluded "[i]t can hardly be said that in this limited time frame there was a sufficient opportunity for Father to have engaged as a parent or willfully left the child while evidencing no intent to return." 2018 WL 1022887, at *6.

Father petitioned this court for review, which we granted. Jurisdiction is proper. See K.S.A. 20-3018(b) (providing for petitions for review of Court of Appeals decisions); K.S.A. 60-2101(b) (Supreme Court has jurisdiction to review Court of Appeals decisions upon petition for review).

The prospective adoptive parents did not challenge in our court the panel's adverse ruling against them concerning their abandonment claim, so that much is settled on review. See *Ullery v. Othick*, 304 Kan. 405, 415, 372 P.3d 1135 (2016).

ANALYSIS

The only ground for termination before this court is K.S.A. 2016 Supp. 59-2136(h)(1)(C): "[T]he father has made *no reasonable efforts* to support or communicate with the child after having knowledge of the child's birth." (Emphasis added.) In this case, the prospective adoptive parents had the burden of proving the termination of

13

parental rights is appropriate through clear and convincing evidence. See K.S.A. 2016 Supp. 59-2136(h)(1).

*Standard of review*

This court engaged in an extensive review of clear and convincing evidence as a standard of proof, as well as an appellate court's review of a trial court's determination based on that standard, in *In re B.D.-Y.*, 286 Kan. 686, 187 P.3d 594 (2008). That was a child in need of care case, but we have applied its holdings governing clear and convincing evidence to parental rights terminations in adoption cases. See, e.g., *In re Adoption of B.B.M.*, 290 Kan. 236, 243, 224 P.3d 1168 (2010).

Clear and convincing evidence is an "intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt." *B.D.-Y.*, 286 Kan. at 691. It applies when "'"particularly important individual interests or rights are at stake."'" 286 Kan. at 697 (quoting *Ortega v. IBP, Inc.*, 255 Kan. 513, 528, 874 P.2d 1188 [1994]).

> "'[A] standard of proof serves to allocate the risk of error [between the litigants] and to instruct the factfinder as to the degree of confidence society expects for a particular decision. To effectuate those purposes, a standard of proof should operate to set the degree to which the factfinder must be persuaded of a particular factual conclusion.'" *B.D.-Y.*, 286 Kan. at 696 (quoting *Taylor v. Commissioner of Mental Health*, 481 A.2d 139, 154 [Me. 1984]).

The *B.D.-Y.* court adopted a definition of clear and convincing evidence requiring that "the factfinder believes that the truth of the facts asserted is *highly probable*." (Emphasis added.) 286 Kan. at 697; see also *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S. Ct. 2433, 81 L. Ed. 2d 247 (1984) (proponent's factual contentions are highly probable "only if the material [the proponent] offered instantly tilted the evidentiary

14

scales in the affirmative when weighed against the evidence [the opponent] offered in opposition").

The *B.D.-Y.* court then turned to appellate review of factual determinations based on that standard. It analyzed then-current Kansas caselaw, as well as that in other jurisdictions, and modified the standard of review, explaining:

> "When an appellate court reviews a trial court's determination which is required to be based upon clear and convincing evidence, it considers whether, after review of all the evidence, viewed in the light most favorable to the [proponent of the finding], it is convinced that a rational factfinder could have found the determination to be highly probable." *B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4.

In conducting this review, an appellate court does not "weigh conflicting evidence, pass on the credibility of witnesses, or redetermine factual questions." *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430-31, 242 P.3d 1168 (2010).

*Discussion*

Natural parents who have assumed parental responsibilities have a fundamental right to raise their children that is protected by the United States Constitution and the Kansas Constitution. *Baby Girl P.*, 291 Kan. at 430. State law expresses our state's public policy that the best interests of children are served by fostering their relationships with their natural parents when the parents have assumed parental duties toward their children. *In re Guardianship of Williams*, 254 Kan. 814, 822, 869 P.2d 661 (1994); see also *In re Kailer*, 123 Kan. 229, 231, 255 P. 41 (1927) ("[T]he welfare of children is always a matter of paramount concern, but the policy of the state proceeds on the theory that their welfare can best be attained by leaving them in the custody of their parents and seeing to it that the parents' right thereto is not infringed upon or denied.").

15

Adoption statutes are strictly construed in favor of maintaining the natural parents' rights when it is claimed consent to adoption is not required by reason of a parent's failure to fulfill statutory parental obligations. *Baby Girl P.*, 291 Kan. at 430. In this case, if the district court properly terminated Father's parental rights under K.S.A. 2016 Supp. 59-2136(h)(1), Father's consent to the adoption would not be required. See K.S.A. 2016 Supp. 59-2129(a). Therefore, the same strict statutory construction is appropriate in this case, as it was in *Baby Girl P.*

In making a finding to terminate parental rights under the statute, a court may "[c]onsider and weigh the best interest of the child" and "disregard incidental visitations, contacts, communications or contributions." K.S.A. 2016 Supp. 59-2136(h)(2)(A)-(B). But the best interests of the child may not be the sole basis for termination because "to hold otherwise would invite courts to seek 'better' families for any number of children whose family circumstances are challenging or financially difficult." 291 Kan. at 435-36. And it is important to emphasize the district court made no finding that it was in C.L.'s best interests to terminate Father's parental rights. We are dealing exclusively with K.S.A. 2016 Supp. 59-2136(h)(1)(C) (no reasonable efforts to support or communicate).

*Baby Girl P.* has meaningful similarities as to how the protections afforded for the natural father's rights were erroneously viewed by the lower courts. And in correcting those views, this court set out principles to be observed in future cases. We noted, for example, there was no legislative call in the statutory scheme "to make the assertion of paternal rights a Herculean task." 291 Kan. at 433. The *Baby Girl P.* case emphasized lower courts must not reward other parties for erecting a "series of hurdles" the natural parent must clear before being able to establish his or her protected interest. 291 Kan. at 433. The only statutory requirement is for the father to make "reasonable" efforts to support or communicate with the child.

16

The *Baby Girl P.* court also rejected the criticism of the biological father's failure to discover the natural mother's deception about a miscarriage. This, the court said, suggested "that a father should disregard the mother's warnings that he is to leave her alone and instead go to her school or place of work or inquire of her friends to determine whether she is pregnant." 291 Kan. at 432-33. And the court went on to explain it would not "read into the statute a requirement that a father invade a mother's privacy to determine whether she is pregnant when the father has sound reasons to believe that she is not." 291 Kan. at 433.

Similarly, the *Baby Girl P.* court concluded the biological father's actions in seeking visitation, offering the custodial parents anything they might need, telling them he was prepared to assume his responsibility to provide for his daughter, and providing her Christmas gifts were "the actions of a father who is attempting to maintain a relationship with his child, *not the actions of a father who is neglecting his child*." (Emphasis added.) 291 Kan. at 434. The court rejected the panel's suggestion "that an all-encompassing offer of support was not reasonable and that a father must undertake additional actions, such as setting up a special bank account for the child whom he is not allowed to support directly, to prove his willingness to provide support." 291 Kan. at 434. The court found "nothing in the adoption statute requiring that a parent must make *extraordinary displays of financial support* in order to avoid a finding of neglect." (Emphasis added.) 291 Kan. at 434.

The *Baby Girl P.* court then held that biological father's actions were not "incidental" activities that could be disregarded. 291 Kan. at 434; see also K.S.A. 2016 Supp. 59-2136(h)(2)(B). "[I]ncidental means 'casual, of minor importance, insignificant, and of little consequence.'" 291 Kan. at 434 (quoting *In re Adoption of McMullen*, 236 Kan. 348, Syl. ¶ 1, 691 P.2d 17 [1984]). The father had "retained counsel, he filed court

actions to obtain visitation, he gave gifts, and he offered to give anything that was needed for his daughter's support." *Baby Girl P.*, 291 Kan. at 434. "[Father's] conduct upon learning that he had a daughter was scarcely casual or insignificant. It *demonstrated a commitment to assuming the role of a father*." (Emphasis added.) 291 Kan. at 434.

Returning to C.L.'s case, we begin by noting there are some obvious problems with the district court's factual recitations. For example, the district court found "[Father] did not ask the case manager to see the child." Yet, the record indicates Father "inquired if he would be able to . . . see the baby." And Kline advised "this is usually dependent on trust with the adoptive family." The point is that Father did ask and was told the visitation outcome depended on the adoptive family.

Also, much is made about Father's medical insurance, but the record is less than clear on this. Father's testimony was that he did not have insurance through his employer when the baby was born because he was on his mother's insurance. But after learning about the baby, he initiated health insurance for himself, believing this would allow him to add the baby to the plan when the time came. And the record further shows paternity was not established until January 2017, so what might have happened after that with the insurance is undeveloped and subject to much argumentative conjecture. In other words, the district court's conclusions on this subject are not supported by clear and convincing evidence.

But more importantly, in reaching its conclusion that Father made no reasonable efforts to support or communicate with C.L., the picture the district court selectively paints with the established facts is incomplete. Cf. *Baby Girl P.*, 291 Kan. at 430 (to terminate under section requiring support during pregnancy, court must consider "all of the relevant surrounding circumstances"). The district court's primary focus was that Father did not create alternative mechanisms to provide financial or material support

through third parties, which in a typical case might be meaningful. But this case is not typical, and Father's unique circumstances should not have been dismissed by the lower courts. After all, Father did attempt to enlist the Shawnee County court to authoritatively establish his rights and support obligations through the paternity action. And when the focus is placed on Father's action, attention is immediately drawn to the "series of hurdles" put in his way in his effort to support his child.

No one disputes Father was unaware Mother was pregnant until after the baby was born. Kline informed him of C.L.'s birth on the evening of Thursday, September 15, two days after the fact. And he was given this news in a phone conversation with a stranger working on someone else's behalf, who was asking him—and expecting him—to relinquish his parental rights as soon as the next day. The record also strongly suggests that by this time, the prospective adoptive parents had already taken C.L. home from the hospital—even though they would later be critical of Father for not visiting C.L. in the hospital as evidence supporting their bid to terminate his parental rights. Additionally, when asked, Kline refused to tell Father who the mother was, so he was left in the dark about that as well. Finally, and as mentioned, Father asked Kline about the possibility of seeing the child and was cryptically advised that was "usually dependent on trust with the adoptive family."

The record is also undisputed that by the next day—a Friday—Father was acting to protect his parental rights. He advised Kline he wanted custody, had retained a lawyer to accomplish this, and gave Kline his lawyer's contact information. Notably, instead of prompting a cooperative opportunity to work with that attorney to explore Father's potential relationship with his child, this news apparently triggered a one-sided, "first strike" race to the courthouse to initiate adoption proceedings in another county that would preempt any lawsuit by Father to establish his paternity and support obligations.

19

That tactical move by the prospective adoptive parents had the desired result, but they admittedly got there by filing a lawsuit without appropriate factual investigation and by alleging false grounds for terminating Father's parental rights. They claimed, for example, that Father had failed to support Mother during the six months prior to C.L.'s birth and abandoned her after having knowledge of the pregnancy, even though he did not learn of the pregnancy and birth until two days after the fact. Worse yet, the prospective adoptive parents, under oath, verified these false accusations as being true. As Judge Malone observed in his concurrence, "these allegations obviously were untrue" given the fact that no one—not even Mother—was aware of the pregnancy. *Adoption of C.L.*, 2018 WL 1022887, at *7 (Malone, J., concurring).

And once forced into the Wyandotte County action, the record is unclear why Father was not personally served until after 5 p.m., Saturday, November 26—just three calendar days before the hearing on the adoption petition. But what is clear is that if Father had failed to appear at the November 29 hearing, he would have been even more seriously prejudiced in his ability to preserve his parental rights. See *Baby Girl P.*, 291 Kan. at 437-42 (Luckert, J., concurring) (parental preference doctrine does not apply when no person appears claiming parental custodial rights at an adoption hearing, citing *In re Adoption of A.A.T.*, 287 Kan. 590, 196 P.3d 1180 [2008]). Yet, Father did appear to assert his rights.

In short, throughout the brief period Father knew about his son, a series of calculated obstructions were placed between him and his child in what was already a difficult circumstance. And each barrier consistently put him in an inferior position that required him to strategically or creatively react to avoid forfeiting his parental rights without any demonstrated willingness from the prospective adoptive parents or KCSL to actually include Father in C.L.'s life. Indeed, the record would reasonably suggest given their experience in these matters that KCSL and the attorney representing the prospective

20

adoptive parents well understood any facilitation of Father's involvement would stymie the adoption outcome they sought.

In its decision, the district court highlighted how no court order prohibited Father from having contact with C.L. But framing the evidence as it did in terms of what Father legally might or could have done despite the obstacles and circumstances—rather than what a *reasonable* person would do in this same situation—is contrary to the statutory dictates that permit termination only when "the father has made no reasonable efforts to support or communicate with the child." K.S.A. 2016 Supp. 59-2136(h)(1)(C). It does not appear either lower court ever seriously considered whether what Father *did* do was a reasonable effort in this particular circumstance, especially since Father only learned of the pregnancy after C.L. was born and further recognizing that Father was not certain he was the biological father until less than 60 days before the termination hearing.

After reviewing all the evidence in the light most favorable to the prospective adoptive parents, this court cannot be convinced a rational fact-finder could have found it highly probable that Father made no reasonable effort to support or communicate with C.L. after having knowledge of C.L.'s birth. The Shawnee County action speaks volumes to this. And how can we say Father has not "accept[ed] some measure of responsibility for the child's future" when he asked the Shawnee County court to declare and delineate exactly that responsibility? *Lehr v. Robertson*, 463 U.S. 248, 262, 103 S. Ct. 2985, 77 L. Ed. 2d 614 (1983).

A putative father need not "undertake additional actions, such as setting up a special bank account for the child whom he is not allowed to support directly, to prove his willingness to provide support." *Baby Girl P.*, 291 Kan. at 434. The corollary under our facts would recognize that Father was not expected to stuff cash in an envelope in hopes that it would later be deemed sufficient or even delivered to the right place. See

21

K.S.A. 2016 Supp. 59-2136(h)(2)(B) (incidental activities may be disregarded). And nothing in the record reflects he had any other reasonable alternative.

But what Father did do, through the advice of counsel, was to promptly ask a court to declare him to be C.L.'s father and issue enforceable orders establishing how support and custody should be achieved as appropriate for the child. His failure to more quickly adjust after his Shawnee County efforts failed because of the Wyandotte County lawsuit is insufficient to "instantly tilt[] the evidentiary scales" in favor of finding he made no reasonable efforts to support or communicate with C.L. "when weighed against the evidence" of the circumstances and the steps he took. *Colorado v. New Mexico*, 467 U.S. at 316. Notably, those steps included filing a paternity action seeking custody and asserting his rights through the court system immediately after learning about both the pregnancy and C.L.'s birth from a social worker that enigmatically told him contact with the baby would hinge on "trust with" the prospective adoptive parents.

Simply put, these were "the actions of a father who is attempting to maintain a relationship with his child, *not the actions of a father who is neglecting his child*." (Emphasis added.) *Baby Girl P.*, 291 Kan. at 434. To hold otherwise would encourage those with another interest to place a "series of hurdles" between a putative father and his child to increase the likelihood of a successful adoption. 291 Kan. at 433. The record in this appeal certainly suggests that possibility. Termination of parental rights should not be determined by which side schemes to be shrewder or more strategic.

In that regard, we echo the comments Judge Malone made in his concurrence when he observed:

> "In light of the preference recognized in the law favoring a biological parent's right to raise his or her child, assuming the parent is fit, it seems to me like this case went

22

off track from the moment C.L. was born. Only three days later, [Father] expressed his desire to assume his parental responsibilities. At that point, instead of rushing to the courthouse to file an adoption petition, all parties involved in the case should have at least temporarily put the adoption plans on hold. In the meantime, KCSL or some other appropriate agency could have conducted an investigation of [Father]'s home and background to see if he would have been a suitable placement option for C.L. Assuming that [Father] passed the initial investigation and background check, C.L. could have been temporarily placed with [Father] for a trial period to be monitored by the appropriate agency or the courts. Then, if any evidence developed that [Father] was not properly caring for C.L., a petition for termination of parental rights could have been filed with the court. Giving [Father] more of a chance to prove his fitness as a father would have been a better approach than rushing into an adoption proceeding and finding out later if there was any evidence to support it." *Adoption of C.L.*, 2018 WL 1022887, at *8 (Malone, J., concurring).

The lower courts erred by failing to focus on all the circumstances when determining whether clear and convincing evidence demonstrated that Father made "no reasonable efforts" to support or communicate with C.L. after knowledge of his birth. K.S.A. 2016 Supp. 59-2136(h)(1)(C). We must reverse their contrary conclusions and remand to the district court to initiate proceedings effectuating a change in custody consistent with this ruling for the now two-year-old child at the center of these unfortunate proceedings.

As was done in *Baby Girl P.*, we acknowledge:

"Years of developing family ties cannot be undone, and a separation at this point will doubtless cause considerable pain. Had the mandates of the statutory process been followed . . . , much potential anguish might have been avoided, and in any case the law cannot be applied so as to automatically 'reward those who obtain custody, whether lawfully or otherwise, and maintain it during any ensuing (and protracted) litigation.' *Matter of Adoption of Halloway,* 732 P.2d 962, 972 (Utah 1986). It is not ours to say

23

whether the trauma that might result from removing [this child] from [his] adoptive family should outweigh the interest of the father—and perhaps the child [himself]—in having [him] raised by [his] natural father." *Baby Girl P.*, 291 Kan. at 436-37 (citing *Mississippi Choctaw Indian Band v. Holyfield,* 490 U.S. 30, 53-54, 109 S. Ct. 1597, 104 L. Ed. 2d 29 [1989]).

Due to these obvious concerns, we remand with instructions similar to those given in *Baby Girl P.* for the district court to recognize the potential traumatic impact of a sudden, precipitous separation of a child from the only parents he has known. We direct the court to expedite the custodial transition process, but we do not specify, as we did in *Baby Girl P.*, that this process be completed within 30 days. The court is in the better position to effectuate how C.L. and Father are to be united without undue delay. The court may in its discretion include the participation of appropriate professional personnel. See *Baby Girl P.*, 291 Kan. at 437.

Reversed and remanded with instructions.

BEIER, J., not participating.
JEFFREY E. GOERING, District Judge, assigned.[1]

---

[1]**REPORTER'S NOTE:**  District Judge Goering was appointed to hear case No. 117,723 vice Justice Beier under the authority vested in the Supreme Court by art. 3, § 6(f) of the Kansas Constitution.