NOT DESIGNATED FOR PUBLICATION

No. 122,152

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of C.M.,
A Minor Child.

MEMORANDUM OPINION

Appeal from Stafford District Court; CAREY L. HIPP, judge. Opinion filed October 2, 2020.
Affirmed.

*N. Trip Shawver*, of Wichita, for appellants natural mother and father.

*Michael C. Robinson*, district attorney, for appellee.

Before ARNOLD-BURGER, C.J., HILL and ATCHESON, JJ.

PER CURIAM: The district court terminated the parental rights of the mother and father to C.M., their four-year-old son. Mother and Father both appeal. After reviewing the record, we hold that there is clear and convincing evidence to support the district court's findings that both Mother and Father are unfit as parents and that the conditions leading to that finding are unlikely to change in the foreseeable future. We also find that a reasonable person could agree with the district court that terminating Mother's and Father's parental rights was in C.M.'s best interests. Thus, we affirm the district court's ruling.

1

*The case history reveals some extraordinary circumstances.*

C.M. was born in 2014. He suffers from several medical conditions that render him completely dependent on others for his care:

> "The minor child . . . has been diagnosed with Lennox-Gastaut Syndrome (LGS), a rare and severe form of childhood onset epilepsy. The minor child has severe global delays and is G/J tube dependent. The minor child cannot walk or talk, has limited eyesight and apparent cognitive delays. All parties agree that the minor child is completely dependent on the care of others."

The Kansas Department for Children and Families began receiving reports about C.M. in January 2015 when he was having seizures, struggling to drink from a bottle, and had to be taken to a hospital. The family refused services at that time. Family Preservation workers became involved after the Department received another report in June 2015 alleging inadequate care. The Department then received two more complaints in July 2015 and November 2016. Family Preservation services continued during this time.

Then, in November 2017, the State asked the court to find C.M. to be a child in need of care after the Department received another report about his medical neglect. The State alleged that Mother and Father were struggling to use C.M.'s feeding tube and they had refused to keep medical staff in the home to care for their child:

> "On November 17, 2017, DCF received a report of medical neglect for [C.M.] due to his parents . . . difficulty using the techniques necessary for their G-Tube dependent and special needs child and their refusal to keep licensed medical staff in the home to provide care for [him].
>         . . . .
> "The parents have fired 6 full time in home RNs since August of 2015. Among the reasons for firing include cutting the child's hair, eating their food (it was offered to her)

and putting information in the nursing notes that [Mother] did not like. The nurses who have left have reported loud arguing by the parents in front of the child, [Father] getting 'in the face' of one of the RNs and yelling at her. This child needs 24-hour skilled care."

After finding that C.M. was likely to sustain harm if not immediately removed from the family home, the court ordered his temporary placement with the State under court supervision.

Mother and Father did not contest the petition, and in March 2018 the court adjudicated C.M. to be a child in need of care. The court ordered that C.M. remain in the Department's custody in an out-of-home placement, with the goal of reintegration with his parents.

Circumstances at home did not improve. In November 2018, the court held that progress to achieve the goal of reuniting the family was inadequate despite the reasonable efforts that had been made by the public agencies in this case. At this point, either adoption or permanent custodianship might be in C.M.'s best interests. The court ordered the State to file a motion to terminate parental rights.

*The record reflects evidence of serious concerns for C.M.'s extensive needs and care.*

We begin by recounting the testimony of the lead social worker in this case. After that, we review the testimony of a neurologist and then five nurses who offered evidence on the State's motion to terminate Mother's and Father's parental rights. Following that, we report the testimony of various social workers that dealt with C.M. and his parents.

Paula Davis, a social worker for the Department, testified about the circumstances that led her to file the petition to remove C.M. from the family home and declare him a

child in need of care. She said the Department first got involved in January 2015. The family refused help from Family Preservation at that time.

Davis testified that Mother and Father accepted help after a June 2015 report said that they were overwhelmed and Mother was struggling to meet C.M.'s needs and manage his feeding tube. Father was often away working as a truck driver, so Mother was providing 24-hour care for the child with no help. Another report in July 2015 said the child was not gaining weight fast enough and there were struggles about getting the right formula into his feeding tube. Family Preservation continued until June 2016, and the family again accepted services in November 2016, including nursing care for eight hours a day. Davis testified that the second year of services did not go as well. C.M. ended up in the hospital from complications with his feeding tube after the family fired the in-house nurse.

The medical team at the hospital met with Davis and told her they were concerned that medical care was no longer being provided and that Mother had shown in the past that she could not handle the work alone. The team concluded that foster placement would be better for C.M., and Davis requested the petition to terminate Mother's and Father's parental rights be filed.

Dr. Dwight Lindholm, a pediatric neurologist who had been C.M.'s primary neurologist since the child was placed in State custody, testified about C.M.'s medical needs. He described the processes for preparing and administering C.M.'s food and medications for the feeding tubes. He said that it required a lot of attention and consistency and needed to be done at the same time each day because missed feedings could cause brain damage or seizures. Dr. Lindholm thought that C.M.'s overall condition had improved since he has been in foster care—where he had been seeing multiple doctors—but that he would never be self-sufficient and would always require skilled nursing care. He said that C.M.'s parents would also need to follow through with

4

exercises and stimulation recommended by C.M.'s visual, speech, physical, and occupational therapists. Spending most of the time rocking or laying with the child would be insufficient for his development. Dr. Lindholm concluded that C.M.'s medical needs were too complicated for Mother and Father to properly care for him.

Then, five nurses that had worked with C.M. testified. Three of them had provided in-home care before the State took custody of C.M. and two had worked with him when he was in foster care.

Nurse Karina Huber provided in-home care to C.M. She testified that C.M.'s original medication regimen was not too difficult if taught and that Mother seemed to understand it, though Father struggled with it. She said that the home was filthy, cluttered, and in poor condition. It had black mold and poor ventilation.

Licia Spencer said that Mother fired her as an in-home nurse after one week because Mother said that she wanted to take care of C.M. on her own and did not need nursing care. She described the home's condition as "really bad." She also said that Mother could do the medications and timed diet.

Marilynn Shanline was the last nurse providing in-home care before the State took custody of C.M. She said that several times when she arrived in the morning, C.M.'s feeding pump alarm would be going off, which indicated that it had not been properly filled to allow C.M. to get the milk. At other times, the feeding bag did not have formula in it.

She also worried about the condition of the house, saying there were dog feces on the floor, extremely dirty carpets, a very dirty bathroom, soiled laundry, and a mouse infestation. She said C.M. spent a lot of time with Father in his rocker or in front of the television and that she never saw Father administer any medications. She worried about

whether Mother could keep up with C.M.'s new diet because Mother was easily distracted and would sometimes fall asleep or leave the house for long periods.

Larisa Reidea provided nursing care for C.M. in foster care and would accompany him on parental visits. She said that during visits, she sometimes needed to remind Mother and Father about feeding C.M. and giving him medications. She also needed to remind them to check C.M.'s blood sugars before feeding him. She was concerned that the parents cannot provide all the care C.M. needs, follow his precise schedules, get the necessary equipment, or do necessary interventions if something goes wrong. She said that Father's inability to do the feeding and medications was concerning because something could happen to Mother. She was also concerned about the amount of cradling and rocking when C.M. visited his parents; she said that nurses have provided them with suggestions on how to stimulate the child but that he spends most of the time in his crib or being held.

Finally, nurse Jordan Voegeli testified. She had also cared for C.M. in foster care. She did not think that Mother and Father were able to care for C.M. by themselves. She also said that the diet C.M. started in foster care has greatly improved his seizures.

Following the nurses, two social workers from St. Francis Ministries testified. Yvonne Nachtigal testified about Mother's and Father's case plans. She said that Mother and Father had completed many of the plan's tasks. They:

- Obtained and followed the recommendations of drug and alcohol evaluations;
- completed drug tests to secure supervised visitation;
- maintained stable income and housing;
- got a mental health evaluation;
- completed individual therapy; and
- completed a parenting assessment.

6

But Mother and Father failed to complete the most important tasks, which involved C.M.'s medical care. She said that Mother and Father missed or rescheduled many medical appointments, even though St. Francis sent them letters each month with C.M.'s appointment dates. She said that they are unable to complete feedings on their own or that they incorrectly mix C.M.'s food. It is crucial to start his feeding exactly on time and carefully follow the instructions. Her concerns about medical care have not changed over the course of this case.

Then the St. Francis Ministries permanency specialist, Bobby White, testified. She said that her big concern about Mother and Father was their inability to meet C.M.'s medical needs. She said that feeding often does not start on time and is not precise, which could have a detrimental effect on C.M. Like other witnesses, she said the majority of visitation time involved rocking with C.M. or sitting with him in a chair. Therapists had given the family a list of different exercises and activities to do with C.M., but Mother and Father did not do those during visitation.

In response, both Father and Mother testified. Father said that they had been feeding C.M. and providing him with medications by themselves before the State took custody of him. He felt that St. Francis Ministries should have given them more training and had not made reasonable efforts to get C.M. back home. Father also denied that there was a problem—he said that the State had taken custody to make money off C.M.

Similarly, Mother did not feel like St. Francis or the nurses had made reasonable efforts to get C.M. back home. She denied missing appointments and said that she did not take notes during doctor appointments because she could memorize the feeding and medication instructions. She did not agree with the witnesses who said she struggled to mix medications or food, and with feeding C.M.

*The court terminated Mother's and Father's parental rights.*

Citing four statutory factors, the district court found Mother and Father were unfit to parent C.M.D.:

- Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family—K.S.A. 2019 Supp. 38-2269(b)(7);
- lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child—K.S.A. 2019 Supp. 38-2269(b)(8);
- failure to assure care of the child in the parental home when able to do so—K.S.A. 2019 Supp. 38-2269(c)(1); and
- failure to carry out a reasonable plan approved by the court directed toward integrating the child into a parental home—K.S.A. 2019 Supp. 38-2269(c)(3).

The court made some important observations about the evidence. Despite the importance of C.M.'s strict feeding and medication regimen, the court found that Mother could not properly administer food and medicine, and she often required prompting. And Father did not involve himself in these processes. Mother also struggled to check and maintain glucose levels, which was necessary before each feeding. The court also noted that, based on the nurses' and caseworkers' testimony, the parents continue to miss medical appointments and spend the majority of time during visitation holding or rocking C.M. rather than provide the therapies and stimulations recommended by various medical professionals involved in C.M.'s care. The court acknowledged that the parents had made some progress on case plan goals but continued to fail to provide the medical care that C.M. requires.

The court also found that the parents' conduct was unlikely to change in the foreseeable future. It noted that the family had been receiving services for all but a few months of the last four years; during that time the court found that Father has made no

progress on managing C.M.'s medical care and Mother has made very little progress. The inability to provide care after years of instruction demonstrated to the court that the situation was unlikely to change in the foreseeable future. The court also noted that both parents continued to believe that social service agencies should not be involved in their lives.

Finally, the court found that terminating both Mother's and Father's parental rights was in C.M.'s best interests. The court looked at the case "in child time" and considered the physical, mental, and emotional health of the child when making that determination.

*We recount the rules that guide us in our review.*

Kansas law on terminating parental rights is not difficult to understand. To terminate parental rights under Kansas law, a district court must first make three findings:
    (1)     The parent is unfit;
    (2)     the conduct or condition making the parent unfit is unlikely to change in the foreseeable future; and
    (3)     termination of parental rights is in the best interests of the child.
K.S.A. 2019 Supp. 38-2269(a), (g)(1).

In turn, when we review the factual findings for the first two, we must determine whether the evidence provides clear and convincing support for the district court's findings. The test is whether a rational fact-finder could have found the facts highly probable based on the evidence. *In re B.D.-Y.,* 286 Kan. 686, 705, 187 P.3d 594 (2008); see *In re Adoption of C.L.*, 308 Kan. 1268, 1278-79, 427 P.3d 951 (2018).

Whether the termination of parental rights is in a child's best interests is based on a preponderance of the evidence and we review for an abuse of discretion. See *In re R.S.*, 50 Kan. App. 2d 1105, 1115-16, 336 P.3d 903 (2014). A district court abuses its

discretion when no reasonable person would agree with its decision or when the decision stems from a legal or factual error. *In re M.S.*, 56 Kan. App. 2d 1247, 1255, 447 P.3d 994 (2019); see *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

Our review of the record compels us to hold that clear and convincing evidence supports the court's findings on the four statutory factors cited earlier. We need not repeat the testimony of the many highly trained medical personnel who testified at this hearing. All agreed that C.M. has extraordinary medical needs and Mother and Father did not meet them.

For several years, Mother and Father struggled to check C.M.'s blood sugar, correctly mix his medication and food, and follow his feeding and medication schedule without prompting. Several people testified that Mother and Father failed to precisely follow the feeding instructions and schedule. Their failure to follow the schedule needlessly exposed C.M. to grave health consequences. Mother and Father also continually neglected to follow through on the varied activities, stimulations, and exercises that C.M.'s doctor and therapists had recommended as essential for his development. Although Mother and Father completed many case plan tasks, they made little to no progress on meeting C.M.'s extensive medical needs.

We hold that clear and convincing evidence supports the district court's unfitness finding based on the four statutory factors. Reasonable efforts by public and private agencies to get the family back together had failed. Mother and Father had shown a lack of effort to adjust their circumstances, conduct, and condition to meet C.M.'s needs. Mother and Father had failed to assure C.M.'s care in the parental home. And Mother and Father had failed to carry out a reasonable, court-approved plan directed toward reintegrating C.M. into their home.

We turn to the next question—whether Mother's and Father's unfitness as parents is likely to change in the near future. In our view, clear and convincing evidence supports the district court's finding that Mother's and Father's unfitness was unlikely to change in the foreseeable future.

We consider the foreseeable future from a child's perspective, since a child's time perspective differs from an adult's. *In re R.S.*, 50 Kan. App. 2d at 1117. Here, by the time the district court terminated Mother's parental rights, the family had been receiving services and instructions for several years but had not shown they were capable of meeting C.M.'s medical needs. The district court properly determined that Mother's and Father's unfitness was unlikely to change in the foreseeable future.

Next, we must decide whether the court abused its discretion when it ruled that it was in C.M.'s best interests to terminate Mother's and Father's parental rights. We may overturn a court's decision on this issue only for an abuse of discretion. A district court abuses its discretion only when it makes a legal or factual error, or when no reasonable person could agree with its decision. See *Smith*, 306 Kan. at 60.

We find no abuse of discretion here. After years of in-home services and a year and a half in State custody—almost a quarter of his young life—C.M.'s parents had not made significant progress on meeting his extensive medical needs, despite the potentially serious consequences to C.M.'s health. They had not learned how to properly administer food and medication, and they did not foster his development by using the techniques that his therapists had shown them. Mother and Father needed to change their conduct so they could provide for C.M.'s health. They did not. A reasonable person could agree with the district court's decision.

Mother and Father try to pull our attention in a different direction. They argue about the district court's temporary custody order and its finding that C.M. was a child in

11

need of care. They contend that the State did not provide preventive and rehabilitative services before removing C.M. from the home. Those issues are not pertinent here, especially when Mother and Father stipulated that C.M. was a child in need of care. Instead, we focus on the task at hand—reviewing the sufficiency of the evidence and the reasonableness of the court's conclusions at the termination hearing.

We recognize that a severance decision such as this can be devastating.

"A parent may be labeled 'unfit' under the law even though he or she loves the child and wants to do the right thing, . . .  But we must judge these cases based mostly upon actions, not intentions, and . . . a child deserves to have some final resolution within a time frame that is appropriate from that child's sense of time." *In re A.A.*, 38 Kan. App. 2d 1100, 1105, 176 P.3d 237 (2008).

It was not an easy decision for the district judge. But the law must be followed.

Affirmed.