MODIFIED[1]

NOT DESIGNATED FOR PUBLICATION

No. 119,166

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Adoption of BABY BOY F.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; KATHLEEN M. LYNCH, judge. Original opinion filed December 7, 2018; modified opinion filed January 24, 2019. Reversed and remanded with directions.

*Marc H. Berry*, of Olathe Legal Clinic, LLC, of Olathe, for appellant natural father.

*Kevin W. Kenney*, of Kevin W. Kenney, P.A., of Prairie Village, for appellees adoptive parents.

Before MCANANY, P.J., PIERRON and LEBEN, JJ.

LEBEN, J.: Court opinions about disputes involving children sometimes seem impersonal. This one involves a young boy we simply call Baby Boy F to protect his privacy. We'll call others by less than their full names too: M.F., his biological mother; William, his biological father; and a married couple who want to adopt Baby Boy F that we'll call the Adoptive Couple.

But beyond the mask of these incomplete names are very real people. And the issues they have presented to this court are among the most important any court can consider. We have done our best to keep that in mind as we reviewed the record in this

---

[1]**REPORTER'S NOTE:** Opinion No. 119,166 was modified by the Court of Appeals on January 24, 2019, in response to a motion to modify filed December 21, 2018. The modified language is incorporated in the last two paragraphs of the opinion, slip op. at 11.

case, heard oral argument from attorneys for William and the Adoptive Couple, and decided the dispute between them. That dispute is over what's to become of Baby Boy F, born January 21, 2017.

FACTUAL AND PROCEDURAL BACKGROUND

His biological parents, M.F. and William, began dating in May 2016 after meeting at their mutual workplace. William soon moved in with M.F.; soon after that, they learned she was pregnant.

But their relationship had deteriorated by November, and William moved out. When he went back a few days later to see M.F., he found that M.F. had moved.

She made arrangements to give their child at birth to an adoption agency, Catholic Charities of Northeast Kansas. One day after Baby Boy F's birth, M.F. signed documents giving up her parental rights and agreeing to have Catholic Charities place Baby Boy F with adoptive parents. In the documents she signed, she said that William was the child's father, that he had accompanied her to one doctor's appointment and one sonogram appointment while she was pregnant, and that he had not provided any financial support to her during the pregnancy. (William later disputed that, but it doesn't affect the issues in this appeal.)

Catholic Charities then placed Baby Boy F with the Adoptive Couple. Two days after Baby Boy F's birth, the Adoptive Couple filed a petition in Wyandotte County District Court to approve their adoption of the child. Among other allegations, the petition said that William had "made no reasonable efforts to support or communicate with the Child after having knowledge of the birth of the Child" and that William had "abandoned or neglected the Child after having knowledge of the Child's birth." Actually,

2

though, William didn't yet know that Baby Boy F had been born—he learned about that only when he was served with the petition a few days later.

Meanwhile, M.F.'s relinquishment of Baby Boy F to Catholic Charities had been filed with the court, as had Catholic Charities' consent to Baby Boy F's adoption by the Adoptive Couple. If William agreed to give up his parental rights to Baby Boy F, the adoption could proceed unchallenged. But he did not.

The court set an initial hearing for February 28, 2017. From statements made at that hearing, we know that William had spoken with the Adoptive Couple's attorney beforehand. The attorney told the court that William had told him "today and a couple weeks ago when we talked by phone that if he is the father, he wants to parent the child." The "if he is the father" language seems to have been based on the attorney's description of how the process normally works—that the court would want to be sure based on paternity tests that William actually was Baby Boy F's biological father before considering any request William might make to claim his parental rights. Even so, William identified himself to the court that day as "[t]he father."

William agreed to genetic testing to determine paternity. The court then asked about his income; William said he made $9.50 per hour. The court said that put him above the poverty level, so he would have to hire his own attorney if he wanted one. He would also have to pay for the genetic testing.

The court made one additional order at its first hearing that we should note. The Adoptive Couple's attorney asked that all information about his clients be sealed and not available to William. The court granted that request, finding that "it's really not relevant who the adoptive parents are in determining whether or not he can parent the child."

3

The court's next hearing was held in April. The Adoptive Couple had filed a motion asking that William be tested for drugs, noting his 2015 conviction for possession of methamphetamine (date of offense, 2013) and other concerns.

As the hearing began, William asked for a continuance, saying that he had just hired an attorney in the past week but that the attorney couldn't attend. The court denied the continuance and ordered drug testing.

The genetic test results were filed with the court in May. They showed the probability that William was Baby Boy F's father at 99.99998%. No one has since disputed that result or William's status as Baby Boy F's biological father.

The court held a trial on the Adoptive Couple's petition on November 10, 2017. The court terminated William's parental rights on the basis that he had failed to make reasonable efforts to support or communicate with the child after having knowledge of his birth. When true, that's a basis provided by statute for terminating parental rights when an adoption petition is pending. We focus, then, on the evidence central to the district court's decision—the evidence related to William's actions after Baby Boy F's birth.

William learned of the birth when he was served with the Adoptive Couple's petition. By that time, Baby Boy F had been placed with the Adoptive Couple. We know from the statement made by the Adoptive Couple's attorney at the court's first hearing that William had said he wanted to raise the child when William first talked to the attorney. But even though William saw the Adoptive Couple at court hearings and had contact information for their attorney and for Catholic Services, he didn't know the Adoptive Couple's names.

Nor did he have any visits with Baby Boy F at any point. That was not by William's choice. William testified that when he hired an attorney, he had his attorney ask for visitation. That was also noted by the Adoptive Couple's attorney, who asked William, "A few months ago, your attorney, on your behalf, suggested visitation with the child. Is that correct?" William agreed that he had. William also had his attorney file a paternity action hoping that visitation might be ordered. But the attorney wasn't able to get that petition served on M.F., a necessary party in a paternity case.

So what evidence did the trial court rely upon to support its key conclusion—that William had made no reasonable effort to support or communicate with the child after his birth? Regarding support for the child, the court said:

- William "provided no money, diapers, formula, or health insurance coverage . . . and did not offer to provide these items or any other form of support to [the Adoptive Couple]."
- William "could have provided a minimum of $50.00 per week to [the Adoptive Couple] for the support of the child," which "could have been provided . . . via their attorney or . . . Catholic Charities."

As for communication, the court said that William "provided no gifts, letters or photographs to [the Adoptive Couple's] attorney or adoption agency Catholic Charities to forward to [the Adoptive Couple]."

The facts the court noted are true—William didn't provide any money or health insurance or diapers to the Adoptive Couple; William admitted that he could have spared $50 per week; and William didn't send gifts or letters intended for the child through intermediaries. Based on those facts and its legal conclusion that these facts were sufficient to terminate William's parental rights, the court both terminated those rights and approved the Adoptive Couple's adoption of Baby Boy F.

William then appealed to our court.

5

The primary issue we must decide is whether the district court properly terminated William's right to parent his son, Baby Boy F. The court's authority to terminate William's parental rights rests on a statute, K.S.A. 2017 Supp. 59-2136(h)(1), which provides that those rights may be terminated if the court finds clear and convincing evidence that one of several factors is present. Here, the court relied on only one factor—that "the father has made no reasonable efforts to support or communicate with the child after having knowledge of the child's birth." K.S.A. 2017 Supp. 59-2136(h)(1)(C).

So we must determine whether clear and convincing evidence supported the district court's finding that William made no reasonable efforts to support or communicate with Baby Boy F after William knew of the birth. When we review a trial court's factual finding to see whether clear and convincing evidence supports it, we must determine whether—viewing the evidence in the light most favorable to the trial court's decision—a rational fact-finder could have found that fact to be highly probable. *In re Adoption of C.L.*, 308 Kan. 1268, Syl. ¶ 5, 427 P.3d 951 (2018).

The Kansas Supreme Court has given us some principles to guide our review. First, "adoption statutes must be strictly construed in favor of maintaining the rights of natural parents." *In re Adoption of Baby Girl P.*, 291 Kan. 424, 433, 242 P.3d 1168 (2010). Second, the focus is on what's reasonable, not what might be the best effort: "We do not find in the statutory scheme a legislative call to make the assertion of parental rights a Herculean task. The preservation of a father's relationship with his child is the starting point of a termination proceeding, not the finish line that a father must labor to reach." 291 Kan. at 433. In the end, the statutory provision at issue in our case, K.S.A. 2017 Supp. 59-2136(h)(1)(C), "requires simply that a father make reasonable efforts to support a child, not that he make extraordinary efforts to have a parental relationship with the child." 291 Kan. 424, Syl. ¶ 5.

With these considerations in mind, let's consider both what William did *not* do (which was the district court's focus) and what he *did* do. Then let's consider in context whether what he did was reasonable. After all, the statute allows the termination of his rights here only if he "made no reasonable efforts."

William didn't know about Baby Boy F's birth until the Adoptive Couple's lawsuit petition seeking to terminate his rights was given to him. By that time, with the approval of Catholic Charities, Baby Boy F was in the care of the Adoptive Couple. Although William had notice of a court hearing that was about a month away, he asked the Adoptive Couple's attorney before that hearing to be able to see his child. We don't know exactly what he was told, but he wasn't given any visits. He then showed up at the first court hearing without an attorney, telling the court that he was Baby Boy F's father and agreeing to genetic testing (at his expense).

After the court told William he earned too much money to have an attorney appointed to represent him at government expense, William met with and hired an attorney before the next court hearing, about 60 days later. We have no data on how easy it is for someone earning $9.50 per hour to find and hire an attorney to represent him in a case involving the possible termination of the client's parental rights. But getting an attorney on board within 60 days seems reasonable.

William then had the attorney file a paternity case in an attempt to get visitation and further assert his rights. That case went nowhere—the child's mother apparently couldn't be found to be given the papers—but it represents an effort by William to establish his right to be Baby Boy F's father. William also asserted his right to be Baby Boy F's parent in the lawsuit brought by the Adoptive Couple.

So did William make no reasonable efforts to support or communicate with the child? If a parent's direct care for a child is the most important and tangible form of

7

support, his first priority had to be asserting his own parental rights in court proceedings. He did that. He took and completed a parenting class. He asked for visits with the child. While incidental visits may be disregarded, K.S.A. 2017 Supp. 59-2136(h)(2)(B), William wasn't given the chance to have any. As for the failure to send letters or photographs, we fail to see how that's really a reasonable way to communicate with an infant.

That leaves William's failure to ask if he could send $50 a week or diapers or clothing to help the Adoptive Couple with the expenses of caring for Baby Boy F. Must a child's father do that in the midst of a proceeding brought by that same Adoptive Couple to terminate his parental rights? Saying that the child's father must do this to preserve his parental rights seems contrary to common sense and the guidance our Supreme Court has given quite recently in the *C.L.* case.

From a common-sense perspective, an adoption agency like Catholic Charities must carefully vet prospective adoptive couples to make sure they have the ability from every perspective—including financially—to raise the child. Indeed, our record shows that the Adoptive Couple was very carefully vetted and ready in every possible way to raise a child when Catholic Services placed Baby Boy F with them.

Even so, does the law require more? Can William's parental rights be terminated simply because he didn't try to send $50 per week or diapers or clothing to the Adoptive Couple?

A similar situation was addressed in *C.L.* There, as here, the baby was placed by an adoption agency with an adoptive couple before the baby's father knew of the birth. There, as here, the biological father hired an attorney, filed a paternity action, and sought to raise the child—but did not provide any financial or material support to the adoptive couple or ask if there were unpaid bills. There, as here, the biological father had bought

8

things like diapers and clothing to use if he gained custody of the child. (William testified he spent about $500 on such items.) Our Supreme Court held in *C.L.* that a reasonable fact-finder couldn't conclude it was highly probable that the biological father there had made no reasonable efforts to support the child after birth. 308 Kan. at 1284.

There are some differences between this case and *C.L.* For example, the father in *C.L.* filed the paternity action even more quickly, and the child's mother was an active party in the paternity action—successfully getting it put on hold until the adoption case concluded. But we don't think these or other differences would justify terminating William's parental rights.

Could William have done more? Sure. But the statute doesn't require that a parent make *every* reasonable effort to support and communicate with the child to keep the fundamental right to be a parent. The statute allows the termination of those rights in the adoption context only when the parent made *no* reasonable effort to do so. That's simply not the case here.

The district court applied a more difficult test for William to meet. It said that "it [was] his obligation to seize every opportunity to assert his rights as a father," citing *In re Adoption of A.A.T.*, 287 Kan. 590, 628, 196 P.3d 1180 (2008). But the author of the *A.A.T.* opinion, Justice Marla Luckert, has pointed out that it arose in a different context. See *Baby Girl P.*, 291 Kan. at 437-42 (Luckert, J., concurring). In *A.A.T.*, the biological father didn't appear in court proceedings to pursue his parental rights until six months after the adoption had been finalized. That meant that the statute to be applied was K.S.A. 2017 Supp. 59-2136(g), which allows the termination of a father's parental rights without the consideration of K.S.A. 2017 Supp. 59-2136(h), the key provision in our case.

In *Baby Girl P.*, *C.L.*, and here, the father had appeared in the court proceedings and contested the termination of his rights. In *C.L.* and here, the sole issue was whether,

under subsection (h)(1)(C), the father had made "no reasonable efforts to support or communicate with the child" after knowledge of the birth. Justice Luckert explained that *A.A.T.* simply doesn't apply in this context:

> "The decision and rationale of *Adoption of A.A.T.* should be limited to the legal question presented there: Whether a finalized adoption should be set aside because the natural father did not receive notice of the adoption proceeding. The reasoning and holding should not be extended to determination of whether a natural father who appears before an adoption is finalized and asserts his parental rights should have those rights terminated." *Baby Girl P.*, 291 Kan. at 442 (Luckert, J., concurring).

In sum, the evidence does not support a conclusion that William made no reasonable effort to support or communicate with Baby Boy F after having knowledge of his birth. We therefore must reverse the district court's judgment, which terminated William's parental rights and approved Baby Boy F's adoption by the Adoptive Couple.

William raised other issues on appeal, including some constitutional challenges to the statute that applies and to the procedures used in the district court. But we generally don't address constitutional issues unless it's necessary to do so. See *State ex rel. Schmidt v. City of Wichita*, 303 Kan. 650, Syl. ¶ 3, 367 P.3d 282 (2016). And we need not do so here.

Before we close this opinion, we want to address three final points.

First, we want to emphasize that the Adoptive Couple has done nothing wrong. They no doubt followed the advice of their attorney and of Catholic Charities, and they also no doubt provided a loving and comfortable home to Baby Boy F. We have reviewed the background assessments of the Adoptive Couple that were submitted to the district court. As one would expect, they were chosen precisely because they were ready, willing,

10

and able to provide a loving and comfortable home to a child. We appreciate the love and care they have provided to Baby Boy F.

Second, we want to emphasize what is not at issue here. We are not searching for who might be the best possible parents for Baby Boy F. The courts are, of course, part of our government, and absent specific and very strong reasons, the government can't take children away from their parents to be raised by someone the government deems a better parent. See *Baby Girl P.*, 291 Kan. at 435-36. The only basis in Kansas statutes for taking Baby Boy F from William was the one we have addressed; it isn't supported by the evidence.

Third, as the Kansas Supreme Court recognized in *C.L.*, our decision today will no doubt cause considerable pain. While that pain cannot be avoided, it can perhaps be lessened by the parties and by the district court acting together to do so. We adopt the remedy fashioned by the court in *C.L.* by directing that William's parental rights be fully recognized and that the change in custody consistent with this decision be accomplished without undue delay. Also consistent with *C.L.*, we authorize the district court to include the participation of appropriate professional personnel in that transition.

The district court's judgment is reversed, and this case is remanded with directions to recognize William's parental rights and change custody consistent with this decision without undue delay.

11