NOT DESIGNATED FOR PUBLICATION

No. 122,886

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of Z.A., D.J., and K.A.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; RICHARD A. MACIAS, judge. Opinion filed February 26, 2021. Affirmed.

*Jordan E. Kieffer*, of Dugan & Giroux Law, Inc., of Wichita, for appellant.

*Julie A. Koon*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before GREEN, P.J., MALONE and WARNER, JJ.

PER CURIAM: In this direct appeal from the termination of her parental rights to three of her children, Mother claims there was insufficient evidence to support the district court's finding that the conduct or condition that rendered her unable to care for her children was unlikely to change in the foreseeable future. Mother also claims the district court erred by finding that termination of her parental rights was in the children's best interests. After carefully reviewing the record, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

This appeal stems from multiple cases related to Mother and three of her children—Z.A., D.J., and K.A.—which were consolidated for appellate purposes. Although the proceedings in the district court involved the children's fathers, Mother is the only parent involved in this appeal. Mother did not contest the adjudications of her

1

children as children in need of care (CINC), and she stipulated in 2019 that she was unfit to parent her children by reason of conduct or condition which rendered her unable to care properly for them. Mother challenges only the district court's findings that the conduct or conditions that rendered her unfit were unlikely to change in the foreseeable future and that termination of her parental rights was in the children's best interests.

Mother gave birth to Z.A. in 2016 and she gave birth to D.J. in June 2017. When D.J. was born, Mother tested positive for amphetamine and admitted to medical personnel that she had used illegal drugs a few days earlier. D.J.'s meconium tested positive for amphetamine and methamphetamine. The day after D.J. was born, Mother admitted the recent drug use to the Kansas Department for Children and Families (DCF) child protection specialist Neyma Zarate and DCF social worker Hillary McGann, but Mother asserted that otherwise it had been years since she had used illegal drugs. Mother and D.J.'s father, who was at the hospital, signed a safety plan and Mother agreed to complete a substance abuse evaluation and cooperate with St. Francis Community Services (SFCS). Mother told DCF workers that her older daughter Z.A. lived with her, but when Zarate spoke with Z.A.'s maternal step-grandfather that afternoon, he said that he was Z.A.'s legal guardian, Z.A. lived with him, and he allowed Mother unsupervised visits with Z.A.

SFCS assigned therapist Shelby Ponder and family support worker Ashley Davis to work with the family. SFCS created an initial case plan that included Mother submitting to requested random drug testing and ensuring that D.J. was always supervised by a drug-free caregiver. Mother also signed a safety plan agreeing to refrain from using illegal drugs or alcohol and to submit to drug testing. Mother went to a substance abuse evaluation on June 19, 2017, and she attended a June 30, 2017, intake appointment for outpatient treatment at Preferred Family Healthcare, but she stopped attending after three group therapy sessions.

Mother at first said she had no concerns about D.J.'s father, but their relationship was tumultuous. In June 2017, Mother reported that D.J.'s father "had tried to 'bust into her house' and take [D.J.]" In August 2017, Mother reported that D.J.'s father had shot her in the arm with a pellet gun. She conceded that they did "not have the 'best' relationship," but said she had nowhere else to live. At the time, D.J.'s father was on house arrest. Later that month, DCF received a report that D.J.'s father had hit Mother while she was holding D.J. and had then hit and spit on D.J.; both parents denied this happened. When Zarate went to the family's home to investigate, Mother was not there and D.J.'s father said he did not know where she was and that she did not tell him about her life. Mother later told Zarate that she was still living with D.J.'s father but planned to obtain her own home as soon as possible.

Mother tested positive for methamphetamine in October and November 2017. When SFCS family preservation worker Jerri Barr spoke with D.J.'s father on December 5, 2017, he alleged that Mother was not taking proper care of D.J. and he said that he had moved out of their home due to conflict with Mother.

By January 2018, it had been over a month since SFCS had in-person contact with the family, so DCF social worker Tai Nittler requested a welfare check at the family's last-known residence. Law enforcement reported that Mother and D.J. were there but Mother said they were being evicted the next day. Mother told police that D.J.'s father no longer lived with them and she identified an apartment complex she and D.J. "were looking to move to." Mother admitted drinking alcohol, denied using drugs, and said she met with SFCS workers weekly.

Nittler went to the home the next day and Mother signed a safety plan in which she agreed to provide accurate contact information to SFCS and to cooperate with SFCS in the future. During the visit, D.J. "appeared safe and appropriate." Mother said that SFCS workers had stopped coming to the home and she did not know why. Mother

3

admitted that she had not engaged in substance abuse treatment and she agreed to complete a drug test the next day, but when she went to do so and was asked to complete a urinalysis (UA) and a hair follicle test, she refused to submit to the hair test and left.

By February 2018, Mother was living at maternal step-grandfather's home. On February 2, 2018, Nittler spoke with Mother on the phone. Mother admitted smoking marijuana but "not recently," and she told Nittler she would not submit to hair testing for drugs, saying she had "done everything she needs to." Mother also claimed that she had spoken with SFCS workers earlier that day and scheduled an appointment to meet with them, but she refused to identify the workers to whom she had spoken, and Ponder later told Nittler that SFCS could not reach Mother. Throughout the call, Nittler heard yelling in the background and she felt "Mother seemed disoriented or unable to focus on the telephone call." Mother eventually told Nittler that she had to hang up because "she was being 'kicked out' of maternal step grandfather's home at the moment and was 'really pissed off.'"

On February 12, 2018, Ponder told Zarate that Mother had "recently stabbed" D.J.'s father. The same day, D.J.'s father reported that Mother was using drugs and he had found a used needle in Mother's purse. D.J.'s father admitted that he and Mother had used illegal drugs; he had three outstanding warrants for domestic violence and probation violations and expected to soon be jailed for violating the terms of his house arrest. According to D.J.'s father, Mother was living at a hotel and D.J. was living with his paternal step-grandmother. When Nittler and police conducted a welfare check, D.J.'s paternal step-grandmother said that Mother often left D.J. with her with no supplies and that Mother and D.J.'s father had nowhere to live. There were no immediate safety concerns and D.J. did not appear abandoned, so D.J. remained in his paternal step-grandmother's care.

4

*The CINC proceedings*

On February 13, 2018, Nittler and DCF supervisor Andrea Bagby agreed that they should begin CINC proceedings for D.J. The next day, they obtained an ex parte order of temporary custody. While removing D.J. from Mother's physical custody at the hotel where she lived, DCF workers saw Z.A. holding a plastic shaving razor with the blades exposed. Thus, DCF also decided to begin CINC proceedings for Z.A. and soon after obtained temporary custody of Z.A.

The State filed a CINC petition as to Z.A. and D.J. on February 15, 2018. Along with the facts set forth above, the State alleged that in 2016, Maternal Step-Grandfather had sought a protection from abuse order against Mother, alleging that Mother had hit him, threatened to kill him, stolen from him, and damaged his home. That petition was later dismissed. The CINC petition also alleged that Mother had a long history of "multiple arrests and convictions for drug related offenses." It chronicled arrests from 2008 to 2017 including a July 2017 arrest for destruction of property and domestic violence and two December 2017 arrests for auto theft, possession of stolen property, and driving on a revoked or suspended driver's license. When the CINC petition was filed Mother was scheduled for a bench trial the week after for criminal deprivation of a motor vehicle and she was also facing a charge of driving on an invalid driver's license.

At a hearing on March 9, 2018, Mother and D.J.'s father submitted statements of no contest to the CINC allegations, so the district court adjudicated D.J. to be a CINC and Z.A. to be a CINC as to Mother. Although the district court continued the adjudication hearing as it related to Z.A.'s father, who was at that point unknown, Z.A.'s father was later identified, and he voluntarily relinquished his parental rights to Z.A. Right after the adjudication hearing, Mother tested positive for methamphetamine.

Mother needed to complete random drug testing within 24 hours of any such request by SFCS. Yet on April 30 and May 3, 2018, Mother failed to complete a requested drug test within 24 hours. At a hearing on May 4, 2018, the district court noted that maternal step-grandfather was no longer Z.A.'s legal guardian and excused him from further participation in the CINC proceedings.

Mother continued to have drug problems. On May 14, 2018, she failed to complete a drug test within 24 hours of the request. On May 17, 2018, Mother was arrested leaving a known drug house and crack cocaine was found in a purse in her possession. She failed to complete drug tests within 24 hours of requests made on June 11, July 9, July 20, August 6, and August 16, 2018. On August 21, 2018, she tested positive for methamphetamine. She failed to timely complete a drug test requested on September 10, 2018. She tested positive for amphetamine and methamphetamine on October 1, 2018, and she tested positive for methamphetamine on November 19, 2018.

The district court held an evidentiary permanency hearing on December 6, 2018, at which it held that reintegration continued to be a viable goal, but the court did not order reintegration at that time. Instead, the district court continued DCF custody and out-of-home placement of D.J. and Z.A., and it ordered Mother, who was pregnant, to sign releases for prenatal care information, provide a certificate of completion of parenting classes, follow recommendations of her clinical assessment, and successfully complete outpatient substance abuse treatment and follow any aftercare recommendations.

In December 2018, Mother gave birth to K.A., who had the same father as D.J. Two days later, DCF received a report that Mother had used methamphetamine while pregnant with K.A. DCF did not seek to remove K.A. from Mother's care because, at the time, she was cooperating with SFCS and participating in reintegration services.

6

Unfortunately, Mother's drug use continued. On January 14, 2019, Mother tested positive for methamphetamine. And on January 28, February 2, February 4, and February 14, 2019, Mother failed to timely complete requested drug tests. At a February 28, 2019 review hearing, the district court again ordered Mother to submit to drug testing, complete outpatient substance abuse treatment, follow aftercare recommendations, and begin actively engaging in individual therapy. But on March 12, March 20, March 25, and April 8, 2019, Mother failed to timely complete requested drug tests. On April 23, 2019, Mother's hair test was positive for methamphetamine. Mother admitted that she had used "the one time" but insisted "'it was not that big of a deal'" and she would not do it again. When asked where K.A. had been while Mother was using, Mother said K.A. "was 'safe and that's all that mattered.'"

On April 26, 2019, DCF assigned social worker Denise Leonard to work with Mother, but Leonard was unable to make sustained contact with Mother, despite calling and stopping by Mother's residence many times. Mother said she would contact Leonard to schedule a time to meet, but Mother did not do so, nor did she respond to Leonard's other attempts to reach her throughout May and June 2019.

During a home visit that also occurred on April 26, 2019, SFCS permanency specialist Wendy Wentworth observed a large sore—the size of a quarter or larger—on K.A.'s bottom; Mother said she was taking K.A. to the doctor that day. Wentworth also noted that K.A. slept with Mother because Mother had no crib for her.

Mother cancelled scheduled visitation with D.J. and Z.A. on April 29, 2019. She failed to timely complete a drug test requested on May 7. She cancelled a visit with D.J. and Z.A. scheduled for May 20, 2019. And on June 3 and June 5, 2019, Mother failed to timely complete requested drug tests.

On June 4, 2019, Ryann Schreck, Mother's substance abuse treatment provider, reported to DCF that Mother was no longer attending substance abuse treatment and had missed enough individual appointments that she was no longer on Schreck's calendar. Moreover, SFCS workers reported that Mother did not stay for the full time allowed for visits with D.J. and Z.A., she yelled at D.J. and Z.A. during the visits, and she was unemployed. Wentworth and SFCS family support worker Billie Amann, who worked with Mother toward reintegration of D.J. and Z.A., stated that Mother did not bring supplies to her visits, she threatened the children, she left the visit room dirty, and she was not nurturing toward D.J. or Z.A. For example, Mother told Z.A. and D.J. once that if Amann was not in the room she "would blister [their] butts." Mother often left K.A. in her car seat during the visits, even feeding K.A. in her car seat instead of holding her, and Mother did not check the children's diapers during visits.

On June 11, 2019, the State filed a CINC petition for K.A. The district court awarded DCF temporary custody of K.A. and DCF placed her with Z.A. and D.J. at the home of their maternal great-aunt and uncle. After the temporary custody hearing, Mother submitted to drug testing and tested positive for benzodiazepine. The next day, DCF learned that K.A.'s hair had tested positive for cocaine. On August 10, 2019, Mother tested positive for amphetamine and methamphetamine. She failed to timely complete a drug test requested on August 19, 2019.

On September 3, 2019, the State filed an amended CINC petition for K.A. and motions to find Mother unfit and terminate her parental rights to all three children. The district court held a hearing on November 4, 2019, at which D.J. and K.A.'s father relinquished his parental rights to both children. Mother submitted a statement of no contest as to K.A. being a CINC, and the district court adjudicated K.A. as such. Mother also stipulated to being presently unfit to care for D.J., Z.A., and K.A. as asserted in the State's motions. The district court accepted Mother's stipulations and found her presently unfit on the following bases:  (1) "The use of intoxicating liquors or narcotics or

8

dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the child," under K.S.A. 2019 Supp. 38-2269(b)(3); (2) "Failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family," pursuant to K.S.A. 2019 Supp. 38-2269(b)(7); (3) "Lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child," under K.S.A. 2019 Supp. 38-2269(b)(8); and (4) "Failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home," under K.S.A. 2019 Supp. 38-2269(c)(3).

With the district court's consent, the parties agreed to continue the termination hearing until February 11, 2020, "to allow [Mother] more time to complete court orders and demonstrate secondary change," and they also agreed that at any future hearing "the State will only be required to prove unfitness for the foreseeable future as to Mother." The district court ordered Mother to participate with DCF in completing a 30-day achievement plan; obtain and maintain appropriate housing and full-time employment, and provide proof of such to DCF; show appropriate parenting skills when visiting with the children; submit to a clinical interview and assessment; successfully complete substance abuse treatment and follow any recommendations involved; submit to drug testing; and comply with all recommendations from SFCS.

At the hearing on February 11, 2020, Mother requested another 90-day continuance; she argued that "her biggest issue to overcome is positive hair" drug tests, which she asserted revealed prior drug use, not current drug use. Mother contended that if the district court continued the hearing, the positive hair results "would, in fact, disappear." The State argued that continuing the hearing would not be in the children's best interests and it asked the district court to deny the request. The district court agreed with the State and proceeded with the hearing.

*Evidence at the termination hearing*

The parties agreed to the admission of 27 evidentiary exhibits, and the district court took judicial notice of Mother's pending criminal case. Before hearing testimony, the district court reiterated that it had found Mother unfit based on (1) her use of drugs; (2) the failure of reasonable efforts to rehabilitate the family; (3) Mother's lack of effort to adjust her circumstances, conduct, or condition to meet her children's needs; and (4) her failure to carry out a reasonable, court-approved, reintegration plan. All parties waived opening argument, and the State began by calling Margarita Carlson to testify.

Carlson worked at Kansas Family Advisory Network (KFAN), an organization that provided services and support during CINC proceedings, including parenting classes, support groups, individual counseling, and referrals to agencies for services KFAN itself did not provide. Mother had contacted KFAN about six months earlier, but although John Slusher, another KFAN employee, had tried to follow-up with Mother to provide services, Mother did not show up for scheduled appointments.

The State next called Mother, who testified that at the time of the termination hearing, she was living in an apartment. Although she had been living in that apartment for a while, she only began to pay rent February 1, 2020. Mother testified that she had completed a substance abuse treatment program on February 4, 2020, after which she was advised to attend two group sessions twice a week for 11 weeks, attend individual sessions with a substance abuse counselor, and go to the Mental Health Association "to revisit [her] mental [health] needs." Mother testified that she had been working at Textron since November 4, 2019 and now had insurance, so she intended to "get properly diagnosed" and see if medication was warranted, although she also stated, "I don't believe in taking medicine." Mother also testified that she attended Narcotics Anonymous (NA) meetings once a week and talked or texted her sponsor at least once a day.

10

Mother testified that she currently had a car that she was driving, which she had bought the prior month. When asked if she had a valid driver's license, Mother testified that she was insured. When again asked if she had a valid driver's license, Mother said, "No. I mean, as of today, yes. I mean, I am insured." She also explained, "I have been pulled over, and the police have ran [*sic*] my license and said my license was just expired, but it is not suspended. So it is just in the process of being insured for a year. I don't know how to answer that question. I'm sorry." But when asked if she would agree with a Department of Motor Vehicles certification that her driver's license was suspended, Mother responded, "Yes." Mother acknowledged that Schreck had spoken with her about driving on a suspended license and that her license had been suspended since 2008.

When asked what she understood she had needed to do since the November 2019 hearing, Mother said she believed she needed to "[c]ontinue to do good and keep doing— moving forward of whatever I was doing. That's what I believe. No drugs, no anything, just keep moving forward." Mother agreed that she had agreed to two achievement plans that required her to do certain tasks, such as a clinical assessment. Mother testified that she had completed the clinical assessment, but she did not get the results directly; the results went to SFCS. Mother stated she believed she asked SFCS workers about the results, but when asked to explain her understanding of the results, Mother said, "Nothing. I mean, nothing. They did receive the information . . . but I didn't get an answer of what it was. I didn't see it personally. I didn't—so I don't know."

Mother testified that she was in individual therapy with Schreck and was about to begin individual therapy with a peer mentor. She later admitted that her sessions with Schreck were targeted solely toward substance abuse, and Schreck was not a licensed therapist. Thus, although Mother at first claimed that she was complying with the recommendation that she engage in individual therapy by seeing Schreck, she later admitted that she was not.

Mother also testified that she believed she had complied with court orders on parenting classes, drug treatment, and recommendations by SFCS. Mother asserted that she had successfully completed an eight-week parenting class, but she could not provide a certificate of completion to SFCS because the pastor at the church where she did her classes had died so she had trouble getting the certificate. But when the State informed Mother that it had received verification that she had completed only seven of eight classes, Mother agreed that was correct and she believed she had one more class to attend to complete the course.

Mother asserted that she had been able to apply some of the things she learned in parenting class during her visits with the children, but when the guardian ad litem asked her to describe that, Mother stated, "I was raising my voice before. And then I tried to get child appropriate things. Like, I read to them. I bring them snacks and stuff." Mother thought the visits "go as good as they can," explaining that Z.A. had just begun opening up to her in the last visit. When asked to explain what she meant by "opening up," Mother said that Z.A. was "getting to be resentful." She testified that she had been told that Z.A. "is nervous and gets sick because of [Mother]," which led to "a lot" of visits being canceled. At one visit, Mother said, she asked Z.A. why she was nervous and Z.A. referred to a time when "the police came into the room and took her from [Mother]."

At another visit, Mother saw Z.A. standing on a couch and told her that if she kept standing on the couch, she would be unable to come to the visit next week. When Mother asked if Z.A. wanted to come back the next week, Z.A. said yes and quit standing on the couch. Mother also said that when she saw the children misbehaving during a visit, she told them to stop, but they did not listen to her. Regarding the length of the visits, Mother said she was never given the opportunity for two-hour visits; most of the visits were one hour long and once she was given the option of a 90-minute visit.

12

When asked what she believed she needed to do to achieve reintegration with her children, Mother replied, "I think I need to keep moving forward, keep doing what I need to do for myself." She also contended that she needed a family support worker, although she was not sure what a family support worker does, and she was not sure whether Amann was her family support worker. She said she wanted family therapy, but she admitted she had never asked Amann or Wentworth to facilitate that. Mother also admitted she went to KFAN "seeking the therapy, seeking my resources," but had not followed up on that because she did not have a phone or a job.

Mother testified that her last drug use was in September 2019. When asked why her hair follicles continued to test positive even though "they say" that "hair follicle results go back 90 days," Mother first replied, "I paid for my own hair follicle." When asked again, Mother stated, "Because the levels are going down." When asked if the positive results continued because she was still using, Mother repeated that she had not used; she explained that her "hair grows slow" and perhaps the hair follicles tested were not collected properly.

Mother explained that although she no longer felt like using drugs, if she did she would "call somebody or . . . go to a meeting or . . . do something productive" like walking. She knew that drugs were not the solution to her problems and she and her sponsor had discussed what to do if she wanted to use—Mother would call her sponsor, write down her steps, go to a meeting, or stay busy by cleaning her house or reading a book. When asked how the district court would know that her situation would keep improving or if there was anything else Mother felt the court should know, she replied:

> "I just want another chance and a little bit longer, so I can show you guys, like, I am thinking about my children in the back of my mind. So I can do this for myself, so I can be that person for my children.

13

"It is hard, and I get nervous to explain everything like that, but I am doing the best I have ever done. And it's just only been five months, and I understand the concern of my drug use and stuff like that, but I have learned from my mistakes, and I will—I can only do better for myself.

"But I want a chance at raising and having my children back."

On redirect, the State questioned Mother about her relationship with a person named Josh; Mother described him as someone she "was seeing" who was on parole. Mother acknowledged that Schreck had voiced concerns about Josh, but Mother said that she had not seen Josh in "[a] few months" though he remained a friend with whom she communicated by phone. She also said, however, that they "no longer talk anymore." When asked if she thought a friendship with Josh was a good decision or a bad decision, Mother said, "I think all friendships are bad decisions with men right now." Later in the proceedings, however, the State introduced evidence—with no objection from Mother— that Mother had contacted Josh that day.

Next, the State called Amann, who had supervised most of Mother's visits with her children and who testified that she had concerns with Mother's parenting skills. Amann testified that Mother had been driving herself to the visits. She also testified that Z.A. had recently not wanted to see Mother and, at a January 27, 2020, visit, Z.A. hid next to Amann's legs and said she did not want to come to visits anymore. Mother asked why and Z.A. "said because the police came and you made me hide in the kitchen," to which Mother replied, "I won't let that happen again." Aman also described Z.A. running away from Mother and, at the same January 27 visit, Z.A. told Mother "I don't want to live with you." Amann said that Z.A. had developed hives during visits. She felt that unsupervised visits—even monitored ones—were not appropriate because Z.A. was not comfortable being alone with Mother. Amann testified that Mother struggled with parenting all three children at the same time and she tended to focus on one child or another. Amann contended that neither D.J. nor Z.A. felt a bond with Mother.

The State next called Wentworth, who testified that after the November 2019 hearing, she completed two achievement plans with Mother. On November 25, 2019, they "went over every measurable short-term goal and/or task towards achievement, and those are stipulated in the achievement plan. And we went down each one of them, and I wrote down [M]other's responses." Wentworth created an updated achievement plan on December 10, 2019. That plan revealed that Mother needed to complete domestic violence and anger management classes. Wentworth spoke to the outreach supervisor, who said that Mother needed to contact the agency, so Wentworth asked Mother to do so. Wentworth testified that to her knowledge, Mother was not involved in domestic violence or anger management classes.

Wentworth testified that Mother's clinical assessment recommended individual therapy, and on December 10, 2019, Mother said she would work on that after she obtained insurance through her employer. But Wentworth stated that as of the time of the termination hearing, Mother had not contacted the Mental Health Association to begin individual therapy. Mother had also failed to complete multiple UAs within 24 hours of them being requested, completing most of requested UAs outside that period. Wentworth described an email from Schreck questioning Mother's involvement with Josh. When Wentworth spoke to Mother about Josh on December 10, 2019, Mother denied seeing him but said they had phone conversations. Yet nine days later, Wentworth saw Mother and Josh together at Walmart.

Wentworth listed the following as tasks she felt Mother needed to do before Wentworth could recommend reintegration: (1) complete UAs within 24 hours of a request; (2) provide clean hair tests; (3) abstain from illegal drugs; (4) follow Schreck's recommendation to complete a clinical interview with the Mental Health Association or another agency; (5) participate in any recommended medication management; (6) repeat domestic violence and anger management classes; (7) maintain releases so that SFCS could obtain information from service providers; and (8) work on her bond with her

15

children. Wentworth noted that she had observed the children at some visits; Z.A. did not want to go into the visits and D.J. seemed "off in his own bubble."

The district court directly questioned Wentworth at length, referring to State's Exhibit 4, which was the December 10, 2019, achievement plan. They went through each task, and the district court asked Wentworth if she believed Mother had completed the task. Wentworth testified that Mother had not completed these tasks: (1) complete UA requests within 24 hours, although Wentworth acknowledged that when Mother did complete a test, it came back negative; (2) complete a clinical interview and mental health assessment and follow any recommendations such as individual therapy or medication management; (3) complete court-approved, age-appropriate parenting classes; and (4) complete court-approved domestic violence and anger management classes. On the other hand, Mother did complete these tasks: (1) complete hair follicle requests every 90 days; (2) sign releases for service providers; (3) complete a substance abuse evaluation and follow the recommendations, although whether she followed all the recommendations was unknown; and (4) follow SFCS' recommendations for services.

Next, the district court turned to the order it issued in November 2019, going through the tasks it had ordered. Mother was to obtain and maintain appropriate housing and provide verification to SFCS; Wentworth testified that Mother provided a lease. Mother was to obtain and maintain full-time employment; Mother started work at Textron on November 4, 2019, and told Wentworth she worked full-time, providing some paycheck stubs. The district court noted that it had heard testimony about its orders that Mother show appropriate parenting skills during visits and submit to a clinical interview. Mother was also to successfully complete substance abuse treatment, arrange for the district court to receive a written report about that, and follow any recommendations; the State clarified that Mother had completed treatment but had not completed all recommendations. The court also noted that Mother had negative drug tests the day of the November 2019 hearing and before the February 2020 hearing as well.

16

The State next called Ginger Hampton, a licensed social worker and the SFCS supervisor assigned to Mother and her family. Hampton had regular meetings about the case, and she reviewed and signed off on the reports submitted to the district court. Hampton recommended termination of Mother's parental rights to all three children. When asked the reason for that recommendation, Hampton explained the concept of child time and noted that Z.A. and D.J. had been out of Mother's custody for two years and K.A. had been out of Mother's custody for over seven months. All three children were placed with Mother's maternal aunt and her spouse and had been there since shortly after coming into DCF custody. There were no concerns with that placement. Hampton also considered the children's physical, mental, and emotional needs before deciding to recommend termination.

Hampton turned to her thoughts on whether Mother was likely to change in the foreseeable future. She did not believe Mother could make sufficient secondary changes in her life "to be able to provide for the physical, mental, and emotional needs of her kids and put their best interest first." Hampton did not think Mother could stay sober and provide for her children in the foreseeable future. Hampton cited Mother's history of relapse, her current pending criminal case, and her dishonesty about the men in her life who might be around the children. Although Hampton conceded that Mother had shown some improvement, she did not see enough improvement to justify continuing trying to reintegrate the family.

Hampton also noted that if the court gave Mother more time to make changes, Z.A. would need therapy. She stressed Z.A.'s need for permanency and contended that the longer the process drew out, the harder it was for Z.A. Hampton testified that although SFCS had not favored giving Mother from November 2019 to February 2020 to show she could change, Hampton might have recommended against termination if Mother had done all the things required by her achievement plan. As it stood, however,

17

Hampton felt—in her professional opinion—that Mother would remain unfit for the foreseeable future. After Hampton's testimony, the State rested its case.

Mother took the stand again briefly. When asked what she "believe[d] about [her] ability to become a fit parent," Mother replied, "That I believe I am the best parent for my children . . . I believe I am fit now, but I still have lots of physical, emotional, and growth that I'm working on within myself for my children, so I can be there for them and stuff, and all of that." Mother testified that she was improving, and she believed she was a fit parent because she was sober, she was "doing better," and she had changed the way she thought and learned to love herself. As for her negative history with men, Mother stated that she was not in a relationship, being in a relationship was not a priority for her, and she would not want anyone unsuitable around her children. After closing arguments, the district court took the matter under advisement.

*The district court's findings*

The parties reconvened on February 21, 2020, for the district court to render its ruling. The district court recited a summarized history of the court's involvement with Mother and her family, noting that although Mother "made some progress at times, it seems like it has always been a step forward and a step back, if not two steps back." The district court also noted that it had heard testimony recommending termination because Mother did not meet the children's emotional or physical needs and because of how long the children had been away from Mother—about two years for D.J. and Z.A. and seven months for K.A. The district judge continued:

> "While [M]other has made some of the court orders, completed some of those tasks, there certainly was a lack of secondary change. And even having completed all of the primary changes, therapy was always kind of an issue and even following through on

18

that. That is the biggest thing is the lack of follow-through or consistencies the Court has seen.

"There is no doubt that the testimony tends to follow that the children need permanency, consistency. The kids are bonding with—the siblings are bonding with themselves. On the positive, there were some times before she had her relapse that the [M]other was clean for about seven months. There was a period of success before that.

"One of the concerns, I suppose, and one of the bigger concerns that was raised is that even during the [M]other's testimony when asked about certain changes, why it is in the best interest to continue, there was a number of things that she couldn't answer, how she would accomplish some of those changes.

"I have no doubt that the mother loves these children, but I don't think she has the ability or certainly hasn't demonstrated the ability in the past to maintain stability, sobriety, and connection with the children. Sadly and unfortunately, even on the day of the hearing, she was arrested for a possession charge of methamphetamine dating back to sometime in September, I think is what it was, was the date of the offense.

"There was also the concern of [Z.A.'s] reaction as to the mother as well. And we already had—I should have said early on, there was already a stipulation as to unfitness as far as to the foreseeable future. After reviewing all of this, it just seems—and based as child's time as we have to look at it. The Court was not convinced that [M]other was going to be able to make those necessary changes in the foreseeable future.

"So it is by clear and convincing evidence, the Court finds that . . . the conduct or condition is unlikely to change in the foreseeable future. Again, that's based on the past two years, on how we look at the case, and where things were as of the evidence that was presented at the last hearing."

Turning to whether termination was in the best interests of the children, the district court noted that the children were in a stable placement, bonded with each other, and Z.A. had at least some negative reaction to Mother. The district court found that it was in the children's best interests, considering their mental and physical well-being, to terminate Mother's parental rights. Thus, the district court ordered Mother's parental rights terminated as to D.J., Z.A., and A.K.

19

The district court filed its written journal entries on March 11 and March 24, 2020. Mother timely appealed and the district court appointed appellate counsel. Soon after, the district court consolidated the proceedings for purposes of appeal.

## DID THE DISTRICT COURT ERR BY TERMINATING MOTHER'S PARENTAL RIGHTS?

Mother argues that the district court erred by terminating her parental rights because there was not clear and convincing evidence to support the finding that her parental unfitness was unlikely to change in the foreseeable future and that termination of her parental rights was in the children's best interests. She asks that we reverse the termination order and give her a chance to continue working a case plan. The State contends that there was sufficient evidence to support the district court's findings and the district court was correct to terminate Mother's parental rights to her children.

"Natural parents who have assumed parental responsibilities have a fundamental right to raise their children that is protected by the United States Constitution and the Kansas Constitution." *In re Adoption of C.L.*, 308 Kan. 1268, 1279, 427 P.3d 951 (2018). In Kansas, if a district court adjudicates a child to be a CINC, the court may then terminate parental rights if it "finds by clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a). A court considering termination of parental rights must also "consider whether termination of parental rights . . . is in the best interests of the child" by primarily considering the child's physical, mental, and emotional needs. K.S.A. 2020 Supp. 38-2269(g)(1). "If the physical, mental or emotional needs of the child would best be served by termination of parental rights, the court shall so order." K.S.A. 2020 Supp. 38-2269(g)(1).

20

"Appellate courts will uphold termination of parental rights if, after reviewing all the evidence in the light most favorable to the prevailing party, they deem the district court's findings of fact to be highly probable, *i.e.,* supported by clear and convincing evidence. Appellate courts do not weigh conflicting evidence, pass on the credibility of witnesses, or redetermine factual questions. [Citation omitted.]" *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430-31, 242 P.3d 1168 (2010).

K.S.A. 2020 Supp. 38-2269(b) sets forth a nonexclusive list of factors a district court shall consider when determining whether a parent is unfit. Here, the district court relied on three of these factors to conclude that Mother was unfit: (1) "[T]he use of intoxicating liquors or narcotics or dangerous drugs of such duration or nature as to render the parent unable to care for the ongoing physical, mental or emotional needs of the children," under K.S.A. 2020 Supp. 38-2269(b)(3); (2) "[F]ailure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family," under K.S.A. 2020 Supp. 38-2269(b)(7); and (3) "[L]ack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child[ren]," under K.S.A. 2020 Supp. 38-2269(b)(8). In addition, because the children were not in Mother's physical custody, the district court considered the factors articulated in K.S.A. 2020 Supp. 38-2269(c) and cited another reason to find Mother unfit: her "[f]ailure to carry out a reasonable plan approved by the court directed toward the integration of the children into a parental home," as set forth in K.S.A. 2020 Supp. 38-2269(c)(3).

The State spends a large portion of its appellate brief defending the soundness of the district court's reasons for finding Mother unfit. But Mother stipulated to her present unfitness and she does not challenge in this appeal the finding that she was unfit. Thus, this court need not review the finding of unfitness.

*Finding that Mother's unfitness was unlikely to change in the foreseeable future*

Mother contends that the district court erred by finding that the conduct or conditions that rendered her unfit were unlikely to change in the foreseeable future. The State first asserts that Mother's minimal briefing should lead this court to deem the point abandoned. Although Mother's argument on this point spans less than two pages, it is not so inadequate that we deem the issue abandoned.

Mother argues that she had made sufficient progress in changing the conduct or circumstances that rendered her unfit that the district court should have concluded that the State had failed to show those conditions and conduct were unlikely to change in the foreseeable future. She points to evidence that, at the time of the termination hearing, she had maintained stable housing for over a year, drug testing showed "declining drug levels" for five months, she had completed multiple treatment programs, she had maintained employment and received insurance benefits, and she consistently participated in visitation with the children. Mother compares her circumstances to those present in *In re S.T.*, No. 121,376, 2019 WL 6795836 (Kan. App. 2019) (unpublished opinion), in which this court reversed a district court's holding that conditions rendering a parent unfit were unlikely to change in the foreseeable future. But a close reading of *In re S.T.* reveals that it is materially distinguishable from this case.

In *In re S.T.*, J.T. appealed the termination of his parental rights to his son, S.T. S.T. was placed in DCF custody shortly after his birth and adjudicated to be a CINC; J.T. sought legal custody of S.T. and had regular supervised visits with him. When S.T. was about two months old, J.T. was arrested and remained in custody until he was convicted of a felony and sentenced, but when he was granted probation, he resumed visitation and continued working toward reintegration with S.T. When S.T. was almost one-and-a-half years old, J.T. violated his probation and the district court ordered him to serve 23 months in prison, after which he had no contact with S.T. 2019 WL 6795836, at *1.

22

The State moved to terminate J.T.'s parental rights and, at the termination hearing, J.T. informed the court that he was scheduled to be released from prison five months later. The district court found J.T. "unfit based on his felony conviction and incarceration and the resulting lack of communication with S.T.," it found that the condition was unlikely to change in the foreseeable future, and that terminating J.T.'s parental rights was in S.T.'s best interests. 2019 WL 6795836, at *2.

On appeal, this court pointed out that at the termination hearing, "the district court proceeded on the assumption that J.T. would be released from prison . . . about six months after the termination hearing." 2019 WL 6795836, at *4. Moreover, an assigned social worker testified that if the district court did not terminate J.T.'s parental rights, he would be permitted to resume visitation when released from prison and resume a reintegration plan, which she estimated would take at least six months. This court concluded that there was insufficient evidence to support the district court's factual finding that J.T.'s unfitness was unlikely to change in the foreseeable future, pointing out that "[t]he two bases on which the district court found J.T. to be unfit would have been substantially mitigated within six months of the termination hearing assuming J.T. were released from prison" at the assumed time. 2019 WL 6795836, at 4. Bound to the confines of the appellate record, this court did not know whether J.T. had been released at the anticipated time or remained incarcerated. Thus, it reversed the termination order and remanded for further proceedings. 2019 WL 6795836, at *5.

Here, Mother argues that, like J.T., her "efforts here indicated that given more time, the conditions supporting the [district court's] bases for termination might be substantially mitigated." She then summarily concludes that "[a]s such, there was not sufficient evidence to support the trial court's finding that Mother was unfit for the foreseeable future." But Mother overlooks a material difference between her circumstances and those present in *In re S.T.*: the finite nature of J.T.'s imprisonment and the undisputed assertion at the termination hearing in that case that J.T. would be released

23

within six months. Here, there is no such asserted date certain on which the conduct or conditions that rendered Mother unfit to parent her children will change. This court has recognized that the "[f]oreseeable future . . . is based on the unique circumstances of the case." See *In re C.S.*, No. 117,714, 2017 WL 5507573, at *4 (Kan. App. 2017) (unpublished opinion). Put simply, the circumstances in *In re S.T.* are different enough from those present here that *In re S.T.* is not germane to resolution of this appeal.

Here, clear and convincing evidence supported the district court's conclusion that Mother's unfitness was unlikely to change in the foreseeable future. The foreseeable future is examined from a child's perspective and a district court may look at a parent's past conduct as one indicator of future behavior. *In re K.L.B.*, 56 Kan. App. 2d 429, 447, 431 P.3d 883 (2018).

At the November 5, 2019, hearing, the district judge explained to Mother that she had until the next hearing "to demonstrate that [the conduct or condition that rendered her unfit] can change in the foreseeable future." The district judge also explained to Mother that it was ordering SFCS to "sit down with you personally . . . and go over the 30-day achievement plan, and that will give a gauge as to how you're moving along, how you're progressing." The district judge then instructed the SFCS representatives in the courtroom: "Sit down with her this week, that way she knows exactly what she needs to do and there won't be any question about it." Wentworth testified that she did so.

But at the February 2020 hearing, Wentworth testified that Mother had not completed all tasks set for her or complied with all the court orders. Hampton similarly testified that Mother had shown some improvement, but not enough for Hampton to feel that continuing reintegration attempts was justified, especially given Z.A.'s increasing agitation about seeing Mother. Essentially, Mother asks this court to reweigh the evidence and find, contrary to the district court, that she was likely to change her

behavior in the foreseeable future. But this court does not reweigh conflicting evidence. *In re K.L.B.*, 56 Kan. App. 2d at 445.

As of the February 2020 hearing, Mother's hair follicles continued to test positive for drugs, she had not completed a domestic violence and anger management class in the time since the November 2019 hearing, she had not started individual therapy as recommended after her clinical assessment, she continued to fail to complete UAs within 24 hours of a request, and although she completed substance abuse treatment, she did not comply with the aftercare recommendations. These were all tasks that Mother was instructed to complete or conditions she was ordered to change in the three-month period before the February 2020 hearing, yet she did not do so.

This court need not consider all of the statutory factors the district court relied on if clear and convincing evidence supports a finding based on one of the factors. See *In re G.A.-S.*, No. 118,579, 2018 WL 2170077, at *3 (Kan. App. 2018) (unpublished opinion). One of the factors the district court cited for finding Mother unfit in November 2019 was her "[f]ailure to carry out a reasonable plan approved by the court directed toward the integration of the children into a parental home." K.S.A. 2019 Supp. 38-2269(c)(3). Taking all of the evidence in the light most favorable to the State and considering that Mother still failed between November 2019 and February 2020 to complete tasks required for reintegration, there was clear and convincing evidence to support the district court's finding that Mother's unfitness was unlikely to change in the foreseeable future.

*Best interests finding*

Once the district court finds that a parent is unfit and is unlikely to change in the foreseeable future, it must determine whether termination of parental rights is in the best interests of the child or children involved. K.S.A. 2020 Supp. 38-2269(g)(1). "In making the determination, the court shall give primary consideration to the physical, mental or

emotional health of the child. If the physical, mental or emotional needs of the child would be best served by termination of parental rights, the court shall so order." K.S.A. 2020 Supp. 38-2269(g)(1).

"The best interests issue is essentially entrusted to the district court acting within its sound judicial discretion. So an appellate court reviews the best interests decision for an abuse of discretion. [Citation omitted.]" *In re M.S.*, 56 Kan. App. 2d 1247, 1264, 447 P.3d 994 (2019). A district court abuses its discretion if it bases its decision on an error of law or fact or if no reasonable person would agree with the district court's decision. *In re P.J.*, 56 Kan. App. 2d 461, 465-66, 430 P.3d 988 (2018).

As Mother notes, this court has held that a court considering whether termination of parental rights would be in a child's best interests must

> "give primary consideration to the physical, mental, and emotional health of the children. In so doing, the court must weigh the benefits of permanency for the children without the presence of their parent against the continued presence of the parent and the attendant issues created for the children's lives. In making such a determination, we believe the court must consider the nature and strength of the relationships between children and parent and the trauma that may be caused to the children by termination, weighing these considerations against a further delay in permanency for the children." *In re K.R.*, 43 Kan. App. 2d 891, 904, 233 P.3d 746 (2010).

Mother summarily argues that because Z.A., D.J., and K.A. are young, "Mother could continue to bond [with] them and be a significant part of their lives," so termination of her parental rights was not in the children's best interests. But as the district court noted, at the time of the hearing, the children were together in a stable placement with a relative, they were bonded with each other, and Z.A. had at least some negative reaction to Mother. D.J. and Z.A. had been out of Mother's physical custody for two years, and K.A. had been out of Mother's physical custody for over seven months. Hampton testified

that if the district court did not terminate parental rights, Z.A. would need therapy, and Z.A. had expressed a desire not to see Mother at visits. Hampton also testified that Z.A. "needs permanency now instead of later" and she attributed Z.A.'s recent behavior to Z.A. being "very, very confused," contending that "the longer we draw this out for her, the harder it is on her." Considering this evidence, we have no difficulty concluding that the district court did not abuse its discretion in finding that termination of parental rights was in the children's best interests.

In summary, there was clear and convincing evidence to support the district court's finding that the conduct or condition rendering Mother unfit to care for her children was unlikely to change in the foreseeable future. Nor did the district court abuse its discretion in finding that termination of parental rights was in the children's best interests. Thus, we conclude the district court did not err by terminating Mother's parental rights.

Affirmed.