NOT DESIGNATED FOR PUBLICATION

No. 123,545

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of Ad.F., K.F., An.F., and Am.F.,
Minor Children.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; DANIEL CAHILL, judge. Opinion filed December 30, 2021. Affirmed.

*James T. Yoakum*, of Kansas City, for appellant natural father.

*Daniel G. Obermeier*, assistant district attorney, for appellee.

Before GARDNER, P.J., HILL and HURST, JJ.

PER CURIAM: Father, the natural parent of Ad.F., K.F., Am.F., and An.F., appeals from the district court's order finding him an unfit parent as to all four children. While the court also terminated his parental rights to the youngest children, An.F. and Am.F., and granted permanent custodianship of Ad.F. and K.F. to the children's maternal grandmother (Grandmother), Father only contests the court's finding of his unfitness and guardianship of the older children. He does not protest the court's termination of his parental rights as to the two youngest children, An.F and Am.F. This court finds the evidence supports the district court's finding of Father's unfitness and affirms its ruling.

FACTUAL AND PROCEDURAL BACKGROUND

On January 3, 2017, Father and Mother were involved in a serious car accident that killed one of their passengers and left them both hospitalized. Father suffered a shattered femur, a lacerated kidney, and a broken neck. Mother was left on life support. While Mother was recovering, physicians discovered that she was several months pregnant with twins.

About three weeks after the car accident, the State petitioned to have the couple's older children, Ad.F., born in 2008 and K.F., born in 2016, declared children in need of care (CINC). The petition noted concerns about the deteriorating condition of the family's house, Father's mental health, and the lack of medical care given to Ad.F. and K.F. According to the petition, the family's house was unfit for human habitation and frequently lacked heat, air conditioning, or running water. The State also alleged that Father refused to allow Ad.F and K.F to see a doctor or dentist and would not allow Ad.F. to wear her prescribed glasses. Ad.F., who was about eight years old at the time, reported that she did not know when she had last been to a doctor and that K.F. had not received medical care since his birth—about six months before the accident. The Kansas Department for Children and Families (DCF) received a report of medical neglect regarding K.F. because Mother and Father had not taken him for any doctor's visits after his birth, despite his abnormal TSH levels, which could result from hyperthyroidism. The petition also described Mother's concerns about Father's ability to care for the children on his own and Ad.F.'s report to social workers that her parents would get into physical fights when they drank.

Based on the allegations in the petition, the district court granted an ex parte order of temporary protective custody for Ad.F. and K.F. While DCF maintained legal custody of the children, Ad.F. and K.F. were placed with maternal Grandmother. The court allowed Mother to stay with them at Grandmother's house when she was released from

the hospital about a month after the car accident, but the court only granted Father supervised and reasonable visitation. The court ordered Father and Mother to cooperate with the recommendations and services of the Kaw Valley Center (KVC). The court also issued a restraining order on Father, directing him "not to harass or attempt to make contact with placement or the children without KVC coordinating that contact."

Tragically, Mother died in April 2017 in part from complications related to the injuries she suffered in the car accident, and physicians delivered the twins—Am.F. and An.F. (the twins), who were three months premature. At birth, Am.F. had a stroke and required a gastrostomy feeding tube, and An.F. had a brain bleed. Both twins also suffered from chronic lung disease. Due to their medical conditions, the twins remained in the Neonatal Intensive Care Unit for some time after birth.

Two days after Mother's death and the twins' birth, the State filed CINC petitions alleging the twins were CINC. The petitions included similar allegations as those filed for their older siblings and stated that Father was unwilling to address the concerns about his mental health as well as his perceived inability to care for the children. Ultimately, the district court issued an ex parte order of temporary protective custody and placed the twins with a foster family—to date they have never lived with Father.

Having adjudicated Ad.F., K.F., Am.F., and An.F. to be CINC on June 23, 2017, the district court issued interim orders for Father to work toward reintegration with the children. Specifically, the court ordered:

- The children remain in the custody of DCF;
- Father's visitation to be determined at the discretion of KVC;
- Father obtain initial family assessments and follow all recommendations;
- Father sign all necessary releases of information for the children;
- Father obtain and maintain income;

3

- Father obtain and maintain stable housing;
- Father's house remain "clutter-free, sanitary" and "not unfit";
- Father maintain contact with the court and interested agencies;
- Father submit to drug and alcohol screening;
- Father obtain a psychological evaluation;
- Father participate in anger management services; and
- Father participate in family therapy.

Over the next two years, Father periodically complied with some of these orders. Unfortunately, Father often exhibited anger and resistance toward the social workers and other service providers who worked with the family. Despite making intermittent progress toward reunification, the service providers reported that Father was unable to control his behavior toward his children and the social workers and he failed—or sometimes refused—to meet the court's orders.

The State's petition included concerns about the condition of Father's home. Father got the home off the "unfit list" and home visits with the older children, Ad.F. and K.F., began around six months after the court entered Father's reintegration plan. Based on the continued improvements, Ad.F. and K.F. were placed back in Father's home later that year. At that time, the house still lacked air conditioning and social workers noted that Father did not have beds, towels, dishes, diapers, toilet paper, or baby wipes. To meet some of the family's needs, KVC provided air conditioning units, a washer, a dryer, bunk beds, cribs, a double stroller, toys, a car seat, highchairs, bus passes, and Walmart gift cards for other household items. Even with the provided air conditioners, the upstairs of Father's home was still hot so Ad.F. and K.F. slept on couches downstairs and social workers noted that these couches "smelled a little bit foul" and that there was often dog excrement scattered around the floor.

4

As Father continued to improve the condition of the home, he was granted supervised home visits with the twins. Unfortunately, because of the twins' medical conditions, including needing breathing treatments and a feeding tube, social workers believed that Father failed to consistently maintain his home in a safe manner for their specific needs. The twins' foster mother noted that they would return dirty from crawling on Father's floor or with vomit, flea bites, smelling like cigarette smoke and with missing clothes. Around this time, concerns were raised about whether the home was suitable for the older children as well.

Several social workers and service providers expressed concerns about Father's volatile and erratic behavior throughout the pendency of the case. One social worker, who performed home visits for nearly a year, explained that Father struggled with "regulating himself" and maintaining an "appropriate parenting style." She explained that Father had trouble keeping himself calm and would frequently raise his voice and yell at her in front of the children—because of these outbursts the social worker felt scared of Father and hesitated to point out issues or suggest areas of potential improvement. Other social workers and nurses described similar experiences where Father screamed at them or behaved strangely. During one supervised visit with the twins, Father became so upset that a nurse took the twins away from him when he began to angrily punch a couch. Rachel Stompoly, who was the main caseworker throughout the case, noted that Father had nearly constant problems with controlling his temper; she recalled that "there were definitely times when he was able to interact calmly, but there were also an equal amount of times where he was not." Throughout the 91 home visits Stompoly conducted during her involvement with the case, she reported that Father had expressed "extreme anger, spouting profanity, yelling at other adults" in front of the children in about half of the visits.

Father inadvertently documented his explosive behavior on February 10, 2019, when Father unknowingly left a voicemail with a KVC social worker. The voicemail

provided a specific example of Father's parenting techniques, showing Father threatening and screaming at K.F.:

> "[S]hut the fuck up, . . . give me my fucking phone back, . . . you ate all my Cheetos. You want to make my life hard. That's what you're doing. . . . leave me alone. You love pissing me off. You love making me mad. Fuck you."

At this time, K.F. was approximately three years old and could be heard crying loudly in the background of the message. After receiving the message, a social worker called Father and sent him the voicemail so he could listen to it. Father explained that the only problem was that he had used foul language when yelling at K.F. He told the social worker that the behavior in the voicemail was just "an intimidation tactic with [K.F.] as a parenting style because he was afraid that [K.F.] was going to be gay because he said I want to be a girl."

A few days after the accidental voicemail, at a meeting to discuss the voicemail, Father's behavior caused social workers to call the police to calm him down. At some point, Father screamed, "I don't need that shit. . . . this is all about a fucking recording. . . . I didn't fucking beat my kid." While Father eventually lowered his voice and began discussing a potential safety plan for the children, he soon got upset again and the police officers had to escort him off the property. Overnight visits with the twins were stopped shortly after the voicemail incident.

Because there was no evidence of physical abuse that evening and K.F was too young to provide sufficient information about what happened, the report of suspected abuse was left unsubstantiated on KVC's records.

Throughout the pendency of the case, Father routinely refused to participate in therapy or other court-ordered evaluations. According to KVC social workers, Father's

behavior resulted in a failure to use the resources KVC provided him and a failure to apply the skills he learned from the services he did use. On one occasion, a social worker explained to Father that he needed to participate in family preservation services or risk losing custody of his children. In response, Father screamed, "I'll take that risk." He often told service providers that family therapy and other recommended classes were unnecessary. Father also never completed the court-ordered individual therapy or anger management classes. Moreover, Father consistently refused to sign releases (for both information and services), often requiring court orders to get him to comply. Father also refused medical treatment for the children; as one social worker explained, "[Father] still feels that services are not necessary for his children and denies mental health or physical needs that they have, despite there being medical evidence that there are issues and concerns."

The deteriorating relationship with the caseworkers—which came to a head in the months after the voicemail incident—led the State to remove the older children, Ad.F. and K.F., from Father's home in April 2019. Soon after, in June 2019, the State filed a motion for termination of parental rights. In its motion, the State alleged that Father had failed to comply with the reintegration plan, was emotionally abusive towards the children, suffered from mental illness or mental deficiency, and that reasonable efforts to rehabilitate the family had failed. The State asserted that the factors above were unlikely to change in the foreseeable future, and that it was in the best interests of the children that Father's parental rights be terminated.

The district court held termination of parental rights proceedings on November 7 and 8, 2019. By that time, Ad.F and K.F. had been in KVC's custody for 22 out of the prior 34 months—the twins had been in their foster home placement for the duration of the case, having only visitations with Father.

7

After assessing the evidence, which included testimony from several social workers, nurses, doctors, caseworkers, and Father, the district court issued a memorandum decision, granting the State's motion in part and denying in part. The district court found Father unfit to parent, noting three specific grounds: (1) his failure to address the identified deficient conditions of his home, his behavior and parenting skills, and the medical needs of his children; (2) his emotionally abusive and isolating conduct towards the children, specifically K.F. and Ad.F.; and (3) his failure to complete the tasks required under the reintegration plan. While the court commented that Father clearly loved his eldest children, it found "the case's lack of progress is the father's fault no matter what he believes." The court pointed out that Father's "constant volatile behavior with workers, professionals, medical personnel, and most importantly his children" was something he consistently refused to address and noted that Father "remains incapable of regulating himself in front of his kids. On countless episodes, [Father] lost his temper to the point of being asked to leave or escorted away by law enforcement." While the court believed that Father could have remedied these issues, it expressed regret that Father chose not to engage in therapy or counseling, concluding that "[Father's] inability to recognize and acknowledge issues, medical, psychological, and others, leave [the children] physically and emotionally vulnerable."

Ultimately, the court found it was in the best interests of the twins to terminate Father's rights because of their medical needs and their lack of any significant bond to their Father, and his unfitness as to their needs was unlikely to change in the foreseeable future. But the court declined to terminate Father's parental rights to Ad.F. and K.F. and instead granted permanent custodianship to Grandmother, under K.S.A. 2020 Supp. 38-2272(a)(2), in order to leave "the door open for a future relationship between the father and his two older children." Father timely appeals from the court's order.

8

A parent has a constitutionally protected liberty interest in the relationship with their child. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Given the paramount importance and unique character of that relationship, it has been deemed "perhaps the oldest of the fundamental liberty interests recognized." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). Based on the fundamental nature of that right, the State may only extinguish the legal bonds between a parent and child upon clear and convincing proof of parental unfitness. K.S.A. 2020 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

A.       *The High Standard for Termination of Parental Rights*

CINC actions, brought under the revised Kansas Code for Care of Children (the Code), stem from the State's interest in protecting the safety and welfare of children within its jurisdiction. K.S.A. 2020 Supp. 38-2201(a) (proceedings under the Code "deemed to be pursuant to the parental power of the state"); K.S.A. 2020 Supp. 38-2201(b)(1) ("safety and welfare of a child to be paramount in all proceedings under the code"). A CINC adjudication is only the beginning step in the process and is often followed by attempts to reunite the children and parents or, in unfortunate circumstances, by the termination of parental rights. See K.S.A. 2020 Supp. 38-2251; K.S.A. 2020 Supp. 38-2269.

Once a court has adjudicated a child as a CINC, it may only terminate parental rights if the State proves by clear and convincing evidence that: (1) the parent is unfit; (2) the conduct or condition which renders the parent unfit is unlikely to change in the foreseeable future; and (3) termination of parental rights is in the best interests of the child. K.S.A. 2020 Supp. 38-2269(a), (g). The statute includes a list of nonexclusive

factors the district court shall consider in making its determination; these factors may amount to unfitness singularly or in combination. K.S.A. 2020 Supp. 38-2269(b)(1)-(9), (c)(1)-(4), (f). The State may also rely on one or more of the 13 statutory presumptions of unfitness outlined in K.S.A. 2020 Supp. 38-2271(a)(1)-(13).

Here, the district court terminated Father's parental rights to the twins, but not to Ad.F. and K.F., who were placed under a permanent guardianship with Grandmother. On appeal, Father does not contest the court's decision that his conduct or condition is unlikely to change in the foreseeable future or that the termination of his parental rights was in the best interests of the twins— Father only contests the court's finding that he is unfit and thus that ordering permanent guardianship of the older children with Grandmother was inappropriate.

In reviewing a district court's decision to terminate parental rights, this court considers whether the evidence presented by the State could have convinced a rational fact-finder that the district court's factual findings were highly probable and thus clear and convincing. *In re Adoption of Baby Girl P.*, 291 Kan. 424, 430-31, 242 P.3d 1168 (2010); *In re B.D.-Y.*, 286 Kan. at 705. Clear and convincing evidence is evidence sufficient to establish "that the truth of the facts asserted is highly probable." 286 Kan. at 697. It is "'an intermediate standard of proof between a preponderance of the evidence and beyond a reasonable doubt.'" *In re Adoption of C.L.*, 308 Kan. 1268, 1278, 427 P.3d 951 (2018). This court reviews the evidence in the light more favorable to the State and will not reweigh conflicting evidence or reassess the credibility of witnesses. Rather, the original fact-finder's credibility determinations are relied upon as they were present to observe the witnesses' demeanor and hear their testimony. *In re B.D.-Y.*, 286 Kan. at 705.

10

B.    *The District Court Relied on Clear and Convincing Evidence of Father's Unfitness*

Kansas statutes include a list of several nonexclusive factors a district court shall consider in making a finding of unfitness. K.S.A. 2020 Supp. 38-2269(b), (c). Any one of the factors may, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 2020 Supp. 38-2269(f). These statutory considerations often overlap and the district court's factual findings under one statute may support termination under a separate statutory subsection. *In re A.M.*, No. 116,986, 2017 WL 3001353, at *4 (Kan. App. 2017) (unpublished opinion). Here, the district court relied on the following statutory factors in finding Father unfit:

- conduct that is physically, emotionally, or sexually cruel or abusive toward a child—K.S.A. 2020 Supp. 38-2269(b)(2);
- failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family—K.S.A. 2020 Supp. 38-2269(b)(7); and
- failure to carry out a reasonable plan approved by the court directed towards reintegration of the children—K.S.A. 2020 Supp. 38-2269(c)(3).

Father argues that the State failed to provide sufficient evidence to establish his parental unfitness. While Father asserts that several of the court's findings are not supported by the evidence, he concedes many of the factual bases for the court's ruling. Father either downplays the significance of, or asks this court to overlook, the testimony regarding his volatile behavior, his refusal to cooperate with the court's orders, and the recommendations of KVC. Ultimately, Father's argument relies on his requests for this court to reweigh conflicting evidence and to redetermine witness credibility, but that is not the role of this court. See *In re B.D.-Y.*, 286 Kan. at 705.

1. *K.S.A. 2020 Supp. 38-2269(b)(2)*

A district court may make a finding of parental unfitness if there is clear and convincing evidence that a parent has displayed "conduct toward a child of a physically, emotionally or sexually cruel or abusive nature." K.S.A. 2020 Supp. 38-2269(b)(2). Here, there is clear and convincing evidence to support this finding.

Father recognizes that "[h]is conduct prior to his understanding what was required of him likely was emotionally abusive or cruel." However, he argues that the instances of emotional abuse and neglect cited by the district court were insufficient to support a finding of unfitness under this factor. The district court specifically noted three instances of abuse in its order of termination: (1) the voicemail where Father screamed at and threatened K.F.; (2) Father's refusal to permit Ad.F. to wear glasses; and (3) Father's isolating behavior towards his children. Each finding is supported by the record.

Multiple social workers testified to the events surrounding the voicemail in which Father screamed at and threatened K.F. Although the report was unsubstantiated—because K.F. was too young to describe to the social workers what happened—the State played the voicemail at the termination hearing and Father did not deny the incident or that he threatened to hit K.F. Rather, Father insisted his behavior was necessary to toughen up his three-year-old son. While there is no proof that Father physically abused K.F. on that occasion, a parent can be considered unfit for engaging in nonphysical abuse. Father's emotionally abusive behavior was a consistent part of his parenting. Regardless of Father's excuse that "[t]here is likely no parent who has not been frustrated by a child's behavior and screamed or cursed at him," social workers noted that Father yelled at and frequently threatened his son, and that K.F. had likely suffered trauma by Father's actions. There is sufficient evidence to support the district court's finding that Father's parenting techniques were emotionally abusive.

12

The evidence also showed that Father failed to properly care for the children in his home and refused to provide them with necessary medical care. Not only did Father refuse to let Ad.F. wear her glasses, he also failed to seek medical care for K.F.'s possible thyroid condition and explained that he did not believe it was necessary to take the children to see doctors or dentists. Even the twins' medical needs did not persuade Father that his children needed to receive medical services—Father even delayed a surgical procedure to remove An.F.'s brain reservoir placed to combat a brain bleed suffered at birth. The evidence supports the court's finding that Father's failure to seek medical treatment in the face of the children's serious medical issues—and his apparent inability to provide them the necessary care in the home—constitutes conduct of a cruel or abusive nature. See *In re J.T.K.*, No. 117,152, 2017 WL 4562641, *5-6 (Kan. App. 2017) (unpublished opinion) (finding a mother's failure to seek medical attention for her child's frostbitten feet constituted cruel and abusive conduct).

Finally, the evidence supports that even after Ad.F. and K.F. were removed from Father's home, he displayed little interest in engaging with them or caring for them during their visits. One social worker noted that Father spent long portions of visits on his cell phone, not paying attention to the children, and would have to be prompted to engage with them or take care of their needs. While the district court did note that Father's "unconditional love for his older two children is unquestioned" it concluded that the evidence also showed that Father was disengaged during much of the pendency of the case, often to the detriment of his children. Father had a pattern of ignoring his older children's needs when they were in the home. During several home visits, the older children would try to spend time with the social workers rather than with Father. One example of his lack of engagement occurred when a social worker noticed K.F. was lying in a pool of his own vomit, and Father had to be instructed to clean up K.F. In another incident, Father ignored K.F.'s crying because he believed the toddler was just doing it for attention.

13

In his brief, Father raises many of the same assertions and excuses he made before the district court, mainly that he now understands that some of his behaviors were inappropriate, abusive, and cruel. However, Father's revelations are years late and the evidence fully supports the district court's findings under K.S.A. 2020 Supp. 38-2269(b)(2). Under the applicable standard of review, this court cannot reweigh the evidence or witness testimony. The record supports the district court's finding that Father displayed conduct of an abusive nature toward his children. Accordingly, there is clear and convincing evidence to support the district court's finding.

### 2. *K.S.A. 2020 Supp. 38-2269(b)(7)*

A district court may also find a parent unfit if there is clear and convincing evidence of a "failure of reasonable efforts made by appropriate public or private agencies to rehabilitate the family." K.S.A. 2020 Supp. 38-2269(b)(7). While this factor requires the relevant agencies to reasonably try to rehabilitate the family, it does not "'require proof that the appropriate agencies made a herculean effort to lead the parent through the responsibilities of the reintegration plan.'" *In re A.Z.*, No. 119,217, 2019 WL 638271, at *7 (Kan. App. 2019) (unpublished opinion); *In re B.T.*, No. 112,137, 2015 WL 1125289, at *8 (Kan. App. 2015) (unpublished opinion). Father concedes that "[t]here is no question that [KVC], itself and with others, made Herculean efforts toward family reintegration." But he argues that he completed most of the orders, evaluations, and classes required of him, and contends that his slow progress was nonetheless still progress. Father's argument does little to overcome that the efforts of KVC failed to rehabilitate his family.

While Father did accomplish some of the reintegration tasks and periodically cooperated with the efforts made on his family's behalf, there is clear and convincing evidence to support the district court's conclusion that these efforts were largely fruitless. Several social workers testified to Father's resistance to KVC's family reintegration

14

efforts. Throughout the case, Father declined assistance and programs, failed to complete required training, refused to sign waivers and releases, and would not attend individual and family therapy or anger management. The primary caseworker throughout the pendency of the case testified that KVC exhausted all possible resources in trying to assist Father; she further testified that in all her years of social work she had never seen a family provided more opportunities. While Father may feel that the services and programs he was provided and encouraged to utilize were insufficient or ineffective, KVC made reasonable efforts to enable and support Father's utilization of the programs and rehabilitation of his family.

Under this court's standard of review, the record contains clear and convincing evidence that KVC made reasonable—and unfortunately unsuccessful—efforts to rehabilitate the family.

### 3. *K.S.A. 2020 Supp. 38-2269(c)(3)*

When children are no longer in their parent's physical custody, a district court may find parental unfitness if there is clear and convincing evidence that there has been a failure to carry out a reasonable, court-approved reintegration plan. K.S.A. 2020 Supp. 38-2269(c)(3). Here, the district court issued its first interim orders after finding Ad.F., K.F., Am.F., and An.F. were CINC, and it updated this reintegration plan throughout the case. Although Father periodically made progress towards completing the required tasks, he repeatedly failed to comply with, or even attempt to fulfill, many of the orders designed to facilitate reintegration. For example, Father failed to:

- Maintain his house in a clutter-free, sanitary, safe, and stable condition for the children;
- sign necessary releases for information and services, which frequently required social workers to obtain court orders;

15

- complete one-on-one parent training;
- participate in anger management; and
- attend the required amounts of family therapy or follow the recommendations from the session he did attend.

As Father points out, he was not entirely unsuccessful and achieved some of the reintegration tasks after Ad.F. and K.F. were removed from home placement. Father claims that he obtained employment in April 2019, after being unemployed for most of the case. Additionally, there is no evidence that Father ever failed a drug or alcohol screening. Father also eventually obtained psychological evaluations, which noted that he had a permanent mild neurocognitive disorder due to several traumatic brain injuries. While the doctor who conducted the examination concluded that Father was not suffering from any mental illness, he observed that Father would likely struggle to care for his children due to his cognitive weaknesses. The doctor also noted that Father would likely benefit from participating in programs that could assist him—if he decided to participate. But Father's reluctance to participate or engage in these services and his combative attitude towards social workers and service providers rendered the resources and reintegration plan fruitless.

The evidence at the termination hearing showed Father's deliberate, intentional lack of cooperation and hostility towards social workers and service providers throughout the case. Father's failure to engage with the reintegration plan and his aggressive attitude led to several social workers being too afraid to work with him. After the voicemail incident and the subsequent fallout, Father's ability to control his behavior further deteriorated and his beliefs that "the system wronged him, that everything was a lie, and it was based on some false allegation[s]" left him unwilling to engage meaningfully with the rehabilitation efforts. As the district court noted, Father's belief that everyone was conspiring against him and his "constant volatile behavior with workers, professionals, medical personnel, and most importantly his children is something he has refused to

16

consistently address" derailed the considerable efforts made by KVC and led to the failure to successfully reunite the family.

CONCLUSION

The district court may rely on any one of the factors in K.S.A. 2020 Supp. 38-2269(b) or (c) for termination of parental rights. Here, the court had ample evidence of numerous factors supporting Father's unfitness, but Father asks this court to reevaluate and reweigh that evidence based on his newly discovered commitment to reintegration. Contrary to Father's assertions, the record is replete with clear and convincing evidence supporting the district court's finding that Father was unfit or otherwise unable to properly care for Ad.F., K.F., Am.F., and An.F.

Affirmed.